**Rick Allan RHOADES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 71595.**

Court of Criminal Appeals of Texas, En Banc.

Oct. 2, 1996.

Rehearing Denied Nov. 20, 1996.

---

James Stafford, Houston, for appellant.

Dan McCrory, Asst. District Attorney, Houston, Matthew Paul, State's Atty., Austin, for State.

### OPINION

MANSFIELD, Judge.

A Harris County jury convicted appellant, Rick Allan Rhoades, of capital murder.[1] At the punishment phase of the trial, the jury unanimously found appellant to be a future danger under Article 37.071 § 2(b),[2] and, further, declined to find mitigating circumstances under Article 37.071 § 2(e). The trial court sentenced appellant to death. We will affirm the judgment of the trial court.

Appellant raises eighteen points of error in his brief on appeal. There are no evidentiary insufficiency points of error. Hence, we will address his points in chronological order where appropriate.

In point number one, appellant contends the trial court impermissibly restricted his right to intelligent and effective use of peremptory challenges, when it prohibited voir dire discussion of the statutory thirty-five year minimum for individuals sentenced to life imprisonment. The substance of appellant's argument is that his right to counsel—as guaranteed by Article I, Section 10, of the Texas Constitution—was impinged when the trial court precluded voir dire discussion of the minimum calendar years appellant would have to serve before being eligible to parole were he sentenced to life imprisonment instead of death. *See Ex parte McKay,* 819 S.W.2d 478, 482 (Tex. Crim.App.1990); *Shipley v. State,* 790 S.W.2d 604 (Tex.Crim.App.1990).

We have held that a trial court commits error if it prohibits defense counsel from asking "proper" voir dire questions. *Caldwell v. State,* 818 S.W.2d 790, 793 (Tex. Crim.App.1991), *cert. denied,* 503 U.S. 990, 112 S.Ct. 1684, 118 L.Ed.2d 399 (1992). A natural corollary to the preceding rule is that a trial court commits *no* error if it precludes *improper* voir dire questioning. A "proper" question is one which seeks to discover a veniremember's views on an *issue applicable to the case. Id.* When an appellant challenges a trial court's voir dire limitation, the reviewing court must analyze the claim under an abuse of discretion standard, the focus of

---

1. Appellant was convicted for violation of what was then Texas Penal Code § 19.03(a)(6), which read in relevant part:
   (a) A person commits an offense if he commits murder as defined under Section 19.02(b)(1) and:
     *   *   *   *   *   *
   (6) the person murders more than one person:

   (A) during the same criminal transaction;

2. All Article references are to those in the Texas Code of Criminal Procedure then in effect.

which is whether the appellant proffered a proper question. *Id.*

We have held that parole, and the issues surrounding the minimum prison term necessary for parole eligibility, are not matters for jury consideration in a capital murder prosecution. *Smith v. State,* 898 S.W.2d 838, 846 (Tex.Crim.App.1995) (plurality opinion), *cert. denied,* —— U.S. ——, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995); *Broxton v. State* 909 S.W.2d 912, 919 (Tex.Crim.App.1995); *Sonnier v. State,* 913 S.W.2d 511, 521 (Tex.Crim.App.1995). Given that juries are not to consider any aspect of parole, a reasonable trial court could find that parole was not an issue applicable to the case. If parole was not an issue applicable to the case, a reasonable trial court could correctly conclude that parole was not a "proper" area of voir dire inquiry. *Ford v. State,* 919 S.W.2d 107, 116 (Tex.Crim.App.1996). Point of error number one is overruled.

■ In his second point, appellant avers that his Sixth Amendment right to counsel was impinged when the trial court precluded him from discussing, with the veniremembers, the statutory thirty-five year minimum for individuals convicted of capital murder who are given a life sentence. Appellant simply declares that his right to counsel was violated, and presents no argument or authority for this contention.

■ It is not sufficient that appellant globally cite the "Sixth Amendment," and nothing else, in support of his request for reversal. *See Vuong v. State,* 830 S.W.2d 929, 940 (Tex.Crim.App.1992), *cert. denied,* 506 U.S. 997, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992). It is incumbent upon counsel to cite specific legal authority and to provide legal argument based upon that authority. *Id.*; Tex.R.App.Proc. 74(f) and 210(b); *Ex parte Granger,* 850 S.W.2d 513, 515, fn. 6 (Tex.Crim.App.1993). This is especially important where, as in the case at bar, the relevant area of law is not well defined.[3] This Court will not make novel legal arguments for ap-

pellant. Point of error two is inadequately briefed, and it is, therefore, overruled.

In point three, appellant claims the trial court committed error by providing false and misleading information about parole eligibility, during the jury selection process. We note that, in appellant's brief, the argument and authority for this point was combined with the argument and authority for points one, two, and four. Hence, it is difficult for this Court to ascertain what information appellant believes the trial court erroneously provided to the veniremembers. Nevertheless, appellant apparently complains of two instances.

■ First, appellant complains the trial court, in response to a question from a veniremember, informed the veniremember that the decision regarding parole eligibility was within the exclusive jurisdiction of the Board of Pardons and Paroles. The exchange follows:

THE COURT: Did you have a question?

VENIREMEMBER: Yes. When will they be eligible for parole?

THE COURT: I can't answer that.

APPELLANT: I ask the court to answer that.

THE COURT: I am not going to answer it. It's within the exclusive jurisdiction of the Board of Pardons and Paroles and the governor of the State of Texas.

PROSECUTOR: Shall I continue?

THE COURT: Please.

Appellant contends that the time for parole *eligibility* is not within the jurisdiction of the parole board at all. Rather, appellant avers, under the current statutory scheme, parole eligibility is within the jurisdiction of the Legislature. *See Article 42.18.* However, whether the trial court's response constituted error is not an issue before this Court because appellant failed to object to the statement. We have long held that, for an issue to be preserved on appeal, there must be a timely objection which specifically states the legal basis for that objection. *Rezac v. State,*

---

3. We note that, even if counsel had properly argued the Sixth Amendment issue, his position is largely untenable. The federal constitutional right to counsel has never been extended to pro-

vide such broad voir dire protection. For a discussion of the cases in this area, *see Ex parte McKay,* 819 S.W.2d 478, (Tex.Crim.App.1991) (Clinton, J., dissenting to denial of rehearing).

782 S.W.2d 869, 870 (Tex.Crim.App.1990). Since, appellant is raising this argument for the first time on appeal, any error is waived.[4]

■ As his second basis for error, appellant contends the trial court misled veniremember Adams when it told her that a person sentenced to death was not eligible for parole, while also stating that a defendant sentenced to life in prison *was* eligible for parole. The relevant voir dire exchange follows:

VENIREMEMBER: ... is he eligible for parole?

THE COURT: Well I think it's obvious if somebody is assessed the death penalty you don't get paroled on a death penalty.

VENIREMEMBER: That doesn't seem to be what is happening, though. Or are we not knowing the full story when we hear things?

THE COURT: You probably don't know the full story, but you aren't paroled on a death penalty. I think that is obvious. I don't think anybody is going to object at this point to my telling you that, which leaves you with the other option, a life sentence.

VENIREMEMBER: And that's the one that you are eligible for parole at some stage, perhaps?

THE COURT: Yes.

APPELLANT: I would request that you overrule the State's motion [in limine regarding parole questions] and inform her fully as to the full ramifications of it.

THE COURT: No.

At no time during this exchange did appellant lodge an objection claiming the trial court misled Adams. Rather, appellant simply asked the trial court to overrule the State's motion in limine. In his brief, appellant now seems to argue that the trial court misled Adams by apprising her of the existence of parole without then informing her of the intricacy of its operation.

We do not have to address the merits of this point because the State exercised a peremptory challenge against veniremember Adams. The alleged error could not have influenced the trial in any conceivable manner. Point of error three is overruled.

In his fourth point, appellant claims that Article 37.071 is unconstitutional if it is interpreted to deny a jury information of the thirty-five year minimum before parole eligibility. Appellant specifically claims that his due process rights protected under both the Fourteenth Amendment, and Article I, Section 19 of the Texas Constitution, were violated when the trial court refused to provide the jury with information of the minimum sentence before parole eligibility. *See Smith; Broxton; Sonnier, supra.*

■ Appellant also contends, under this point, that his Article I, Section 13 rights guaranteed by the Texas Constitution were violated. As to the latter argument, appellant is presumably referring to the Texas right against cruel or unusual punishment. In any event, appellant does not designate in his brief, and we cannot find in the record, where appellant lodged his Article I, Section 13 objection in the trial court. Without such an objection, any error in this regard has been forfeited. *Rezac v. State*, 782 S.W.2d at 870.

■ As to appellant's federal due process claim, this Court has settled the issue unfavorably to appellant. *Broxton, supra.* With regard to his Texas due course of law contention, appellant presents no argument or authority as to how the protection offered by the Texas Constitution differs from the protection guaranteed by the Federal Constitution. His claim is, therefore, inadequately briefed and presents nothing for our review. Tex.R.App.Proc. 74(f) and 210(b); *Smith v. State, supra,* at 847; *Ex parte Granger, supra,* at 515, fn. 6.

Appellant finally claims, under this point, that his right to equal protection, as protected by the Fourteenth Amendment, was violated. Appellant specifically claims that capital defendants are treated disparately from non-capital defendants. Appellant's argu-

---

4. Appellant does not assert a right to present an untimely objection under the guise of an "absolute right" or a claim of a "waivable-only right."

*See Marin v. State,* 851 S.W.2d 275 (Tex.Crim. App.1993).

ment was rejected in *Smith v. State, supra.* Point of error four is overruled.

■ In point eleven, appellant contends that two inconsistent versions of Article 37.071, as enacted by the Texas Legislature, were in effect during the time of appellant's trial. Appellant argues that the existence of these two versions resulted in a conviction which violated his rights under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the Federal Constitution, and his rights under Article I, Sections 10 and 19 of the Texas Constitution.

Specifically, appellant complains that two legislative amendments—Senate Bill 880 and House Bill 9—both effective on September 1, 1991, are conflicting. *See Tex. H.B. 9, 72nd Leg., R.S. Ch. 652* and *Tex. S.B. 880, 72nd Leg., R.S., Ch. 838.* To establish this purported conflict, appellant notes that Senate Bill 880 amended Article 37.071 so as to delete the special punishment issues concerning "deliberateness" and "provocation," while such a deletion was not reflected in House Bill 9. Appellant argues that there is an "irreconcilable conflict" between the two enactments such that the following rights were violated: First, appellant did not have effective assistance of counsel because he could not know which enactment applied. Second, appellant claims he was unable to effectively prepare and conduct voir dire because of improper statutory uncertainty. Although appellant, in this appeal, presents a "laundry list" of alleged constitutional violations, we will address only the two claims specifically argued in his brief.

■ Appellant has failed to indicate in his brief, and we cannot find in the record, where he lodged an objection to Article 37.071 in which he claimed "irreconcilable conflict." These objections were not raised with the trial court; they are raised for the first on appeal. As we held, *supra,* for an issue to be preserved on appeal, there must be a timely objection which specifically states the legal basis for that objection. *Rezac v. State,* 782 S.W.2d at 870. Appellant has failed to argue, and we decline to hold in this

context, that an untimely objection—under the guise of an "absolute right" or a claim of a "waivable-only right"—is applicable in this case. *See Marin v. State,* 851 S.W.2d 275 (Tex.Crim.App.1993).[5]

Appellant seems to argue—for the first time on appeal—that even without a trial objection, this Court can review the jury charge to determine if there was a defect so egregious that it deprived appellant of a fair trial. Appellant is correct. *Almanza v. State,* 686 S.W.2d 157, 171 (Tex.Crim.App. 1984). However, there was no error in the Article 37.071 charge because it is plain that there were never two versions of .Article 37.071 in existence. If there is no charge error, *Almanza* has no application.

The Texas Constitution contains a provision which governs the amendment of statutes:

> Sec. 36. No law shall be revived or amended by reference to its title; but in such case the act revived, or the section or sections amended, shall be re-enacted and published at length.

*Tex. Const. art. III, § 36.*

Hence, to amend a statute, the Legislature must indicate changes by interlineating the modifications onto the text of the statute as the text was prior to amendment. The purpose of this requirement is straightforward:

> An amendment which sought to insert words or substitute phrases by reference with no publication could well mislead as to its effect. Such was sometimes the intention. Great confusion was introduced into the law, and to eliminate the uncertainty and confusion, the constitution wisely requires amended statutes to be re-enacted and published so that their meaning may be known without the necessity of examining the statute amended.

*Tex. Const. art. III, § 36 interp. commentary (Vernon 1984).*

House Bill 9 made a single substantive change to Article 37.071. That change was the addition of Section One, in which the

---

**5.** Appellant cites *Almanza v. State,* 686 S.W.2d 157 (Tex.Crim.App.1984), for the proposition that an objection is unnecessary if error is egregious or fundamental. However, the *Almanza* holding is limited to charge error; *Almanza* has no application to this context.

State might elect to decline pursuit of a death sentence in a capital case. *Tex. H.B. 9, 72nd Leg., R.S. Ch. 652, § 4.* To indicate this change, the Legislature was compelled to "re-enact" the entire statute as it was before amendment. Article 37.071 did not yet contain the changes made by Senate Bill 880 because these changes were made during the same legislative session and had not yet taken effect. Hence, House Bill 9 does not contain the changes made by Senate Bill 880.

Senate Bill 880 made more extensive amendments. These changes essentially involved the elimination of the "deliberate" and "provocation" prongs of the jury charge, and the addition of the mitigation finding. To signify these changes, the Legislature was required to "re-enact" the entire statute, as it was before amendment. House Bill 9 was not yet part of Article 37.071.

The Legislature, anticipating appellant's argument, enacted the following provision in the Code Construction Act:

> (b) ... [I]f amendments to the same statute are enacted at the same session of the legislature, one amendment without reference to the other, the amendments shall be harmonized, if possible, so that effect may be given each.
>
> (c) In determining whether amendments are irreconcilable, text that is reenacted because of the requirements of Article III, Section 36, of the Texas Constitution is not considered to be irreconcilable with additions or omissions in the same text made by another amendment. Unless clearly indicated to the contrary, an amendment that reenacts text in compliance with that constitutional requirement does not indicate legislative intent that the reenacted text prevails over changes in the same text made by another amendment, regardless of the relative dates of the enactment. *Tex.Gov't Code § 311.025(b) and (c).*

Upon review of House Bill 9, and Senate Bill 880, we find the two enactments are perfectly reconcilable. Each makes substantive changes the other does not; there is no conflict when one comprehends how statutory amendments are achieved. There being no conflict, appellant's argument that there were two inconsistent versions of Article

37.071 in effect during his trial is without basis. Point of error eleven is overruled.

In point seventeen, appellant claims the trial court erroneously restricted voir dire questioning regarding factors that particular veniremembers considered mitigating. Appellant simply cites page references where he claims such a restriction occurred and provides no argument or analysis in support.

■ When a defendant challenges a trial court's limitation on voir dire questioning on appeal, the reviewing court must analyze the claim under an abuse of discretion standard, the focus of which is whether appellant proffered a proper question. *Caldwell v. State,* 818 S.W.2d 790, 793 (Tex.Crim. App.1991), *cert. denied,* 503 U.S. 990, 112 S.Ct. 1684, 118 L.Ed.2d 399 (1992). A proper question is one which seeks to discover a veniremember's views on an issue applicable to the case. *Id.* at 794. If a proper question is disallowed, harm to appellant is presumed because he has been denied the ability to intelligently exercise his peremptory strikes. *Id.* However, the trial court may restrict questions in which counsel attempts to commit a veniremember to a particular resolution based upon facts peculiar to the trial. *Coleman v. State,* 881 S.W.2d 344, 350–51 (Tex.Crim.App.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 763, 130 L.Ed.2d 660 (1995).

■ In appellant's first contention, he claims an improper voir dire restriction in the following exchange:

> APPELLANT: Drug usage, could that ever be mitigating factor to you in the proper situation?
>
> PROSECUTOR: Your Honor, again I have to object to trying to commit Mr. Tomlinson to exactly what things he would consider mitigating ...
>
> THE COURT: Okay. Let me reiterate.
>
> APPELLANT: Can I ask the court to rule on her motion so I could respond?
>
> THE COURT: I am sustaining it as far as committing....

This questioning occurred just after appellant told the veniremember that the law *required* him to consider drug use to be mitigating. Appellant was not asking whether

the veniremember could *consider* drug usage in the punishment portion of the trial; rather, appellant was asking whether the veniremember *believed it to be mitigating.* *See Penry v. State,* 903 S.W.2d 715, 736 (Tex. Crim.App.1995). Indeed, the evidence adduced at trial indicated that appellant was intoxicated when he committed the murders. In this context, the trial court could reasonably find such a question to be an impermissible effort to commit the veniremember to a particular set of facts. *Coleman v. State, supra.*

■ Upon review of appellant's second claimed voir dire restriction, we find the limitation to be within the trial court's discretion. Appellant asked veniremember Tomlinson whether he thought good conduct in prison to be an aggravating factor or a mitigating factor. Appellant was attempting to elicit, not whether the veniremember could consider good conduct in prison as mitigation, but whether the veniremember would find good conduct in prison to be mitigating. There was evidence presented at trial that appellant was a good prisoner before the killings. A rational trial court could find that such questioning was an improper attempt to bind the veniremember to a particular finding based upon the facts presented at trial. *Id.*

Our review of appellant's third claim fails to uncover a voir dire limitation. The following exchange occurred:

APPELLANT: What would be mitigating at the time of punishment? You kind of ruled out bad childhood in a way.

VENIREMEMBER: Oh, no, I mean, there could be a combination of things.

PROSECUTOR: Your Honor, I have to object to trying to commit Ms. Jones as to exactly what she would consider as mitigating. As long as she would consider any mitigating evidence.

THE COURT: I understand. I don't understand the question to be trying to commit her.... So if you just want to talk about in general terms.

The trial court then permitted appellant to continue questioning the veniremember in general terms. There was no voir dire limitation.

Our review of appellant's fourth claim again indicates that the trial court reasonably restrained appellant's questioning. Appellant was attempting to commit the veniremember to drug use as a mitigating factor. As we held, *supra,* given the nature of this case, such a restriction was reasonable. Finally, upon review of appellant's final contention, we fail to find a voir dire restriction. Although the State objected to appellant's mitigation question, the trial court did not rule on the objection. Hence, appellant was permitted to ask the question.

The trial court legitimately exercised its discretion when it prevented appellant from asking questions which committed veniremembers to particular factual findings which were peculiar to the case on trial. Point of error seventeen is overruled.

■ In point nine appellant claims the trial court erred when it permitted the State to exercise a peremptory challenge against veniremember Berniece Holiday, in that the challenge was racially motivated and a violation of *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Under *Batson,* the procedure to determine an equal protection violation has three prongs in the context of racial discrimination: First, the opponent of the peremptory challenge has to prove a prima facie case of racial discrimination (step one). If this burden is met, the burden of production falls to the proponent of the strike to tender a race-neutral explanation (step two). If a race neutral explanation is tendered, the trial court must then determine if the opponent of the strike has proved purposeful racial discrimination (step three). *See also Purkett v. Elem,* —— U.S. ——, —— ——, 115 S.Ct. 1769, 1770–71, 131 L.Ed.2d 834 (1995). This court reviews the trial court's finding, *vel non,* of purposeful discrimination under a clearly erroneous standard. *Wheatfall v. State,* 882 S.W.2d 829, 835 (Tex.Crim.App.1994), *cert. denied,* —— U.S. ——, 115 S.Ct. 742, 130 L.Ed.2d 644 (1995). When applying the clearly erroneous standard, this Court will not disturb a trial court's ruling unless we are left with a definite and firm conviction that a mistake has been committed. *Vargas*

*v. State,* 838 S.W.2d 552, 554 (Tex.Crim.App. 1992). In making this determination, this Court will review voir dire, the State's race-neutral explanations, the composition of the jury panel, and appellant's rebuttal and impeachment evidence. *Id.*

To make his prima facie case at trial, appellant made several observations to the trial court. First, appellant confirmed that veniremember Holiday was black. Second, appellant noted that Holiday was the first black veniremember to be interviewed from the fourth jury panel. Appellant also noted that Holiday's answers seemed very State-oriented. Finally, appellant contended that the State used a peremptory strike against Holiday only two minutes into appellant's voir dire questioning. Appellant claims that the State, by interrupting his voir dire examination to lodge a peremptory strike, changed its pattern of asserting peremptory strikes. These were the only arguments appellant advanced in his effort to demonstrate a prima facie case.

The State contested the legitimacy of appellant's prima facie case. The trial court, nevertheless, ordered the State to provide its race-neutral reasons for the strike. The State provided several race-neutral reasons: (a) Holiday "dozed off" during the State's group voir dire examination; (b) Holiday's answers were very succinct, in a way which demonstrated a lack of candor; (c) Holiday only answered three of seventeen questions on a particular page of her juror questionnaire; (d) Holiday's facial expressions led the prosecutor to believe that she was saying what she believed the prosecutor wanted to hear; (e) Holiday was an elementary school teacher and might identify too closely with evidence of appellant's difficult childhood; (f) Holiday indicated, with a tone of pride, that, while previously serving on a jury, she "set free" the defendant; (g) Holiday had a first cousin who was in prison. In addition, the State noted that over 64 veniremembers had been questioned to that point, and of those 64 this was the first black veniremember the State peremptorily challenged.

The trial court, noting that it too had observed Holiday napping during voir dire, declared the State's rationale for striking Holiday to be racially neutral. The trial court then overruled appellant's *Batson* motion.

The record does not manifest whether the trial court ever determined that appellant met his prima facie burden. In Texas, however, once a party articulates the reasons for a peremptory challenge, and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot. *Wheatfall v. State,* 882 S.W.2d at 835.

Upon review of the record, this Court is not left with a definite and firm conviction that error was committed. Appellant's showing of purposeful discrimination was minimal. The State's race-neutral explanations were not whimsical, *Purkett, supra,* and the record does not reflect that the State demonstrated a disparate pattern of strikes against any suspect class. Point of error nine is overruled.

In point ten, appellant claims *Batson* error as to veniremember Gregory Randle. To support his prima facie claim, appellant stated into the record that: (a) Randle was black; (b) the Harris County District Attorney's Office has had a history of trying to exclude blacks from juries; (c) Randle was observant and intelligent, and considerate of the prosecution; (d) Randle was "protective as to society." The trial court ordered the State to provide its race-neutral reasons without ruling upon whether appellant properly made a prima facie case.

The State's explanations were: (a) Randle had a brother in prison, and although Randle had visited him recently, Randle professed that he did not know what crime his brother committed. The prosecutor professed that she was concerned Randle was being disingenuous, and down-playing the effect his relationship with his brother would have on him; (b) Randle vacillated on the kind of evidence he would require to find future danger. Although this vacillation was not legally sufficient to subject Randle to a challenge for cause, he nevertheless occasionally articulated that he would prefer evidence of past violent behavior to find future danger (the

State had no evidence of past violent behavior); (c) Randle indicated during voir dire that he thought the death penalty was wrong, although he conceded that it might be necessary for some crimes.

Appellant then disputed the State's interpretation of Randle's voir dire answers. The judge found the State's reasons to be race-neutral and overruled appellant's objection. Given the utter lack of any real evidence that the State purposefully discriminated against Randle in the record, and the relative strength of the State's explanations, we are not left with a definite and firm conviction that a mistake was committed. Point of error ten is overruled.

■ In point eighteen, appellant contends the trial court erred when it refused to admit, during punishment, eleven childhood photographs which depicted him as a normal, happy child. Appellant argues that the trial court's preclusive ruling denied him the opportunity to present relevant, mitigating evidence in his defense. When the trial court asked appellant to demonstrate relevance, he made the following argument:

> My point is the State has introduced photographs throughout the dehumanizing stage of their punishment hearing, showing various photographs of him when he was arrested at the time of seventeen, eighteen, throughout, mug shots. To aid the jury to understand the development of the defendant through his various stages of his life, we also have the right to show the human side of the defendant as much as the State has attempted to dehumanize and turn him into some sort of monster. I think, under Penry and under the mitigation portion stage of the trial, the jury should be entitled to see the defendant grow and what various stages [sic]. Talking about elementary school and how he appeared, et cetera, et cetera. And let them give whatever weight they think is necessary. It's very material to our lawsuit.

Thus, appellant was trying to "humanize" his client by demonstrating that he was once a normal child.

■ Within the meaning of Article 37.071, § 2(a), evidence "mitigates against the imposition of the death penalty" if a reasonable juror could conclude that the evidence was a basis for a sentence less than death. *Alvarado v. State*, 912 S.W.2d 199, 217 (Tex.Crim.App.1995) (plurality opinion). Article 37.071, § 2(f)(4) provides further guidance when it defines mitigating evidence "to be evidence that a juror might regard as reducing the defendant's moral blameworthiness." As we observed in *Alvarado*, if a reasonable juror could not conclude that the proffered evidence reduced the defendant's moral blameworthiness, then a trial court would be within its discretion to exclude the evidence. *Alvarado v. State*, 912 S.W.2d at 217.

The U.S. Supreme Court has never suggested that sentencers be given—in the context of mitigation—"unbridled discretion in determining the fates of those charged with capital offenses." *Franklin v. Lynaugh*, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (plurality opinion). As the Supreme Court observed in *Franklin, supra*:

> We find unavailing petitioner's reliance on this Court's statement in *Eddings [v. Oklahoma]*, 455 U.S. [104] at 114 [102 S.Ct. 869, 877, 71 L.Ed.2d 1 (1982) ], that the sentencing jury may not be precluded from considering "any relevant, mitigating evidence." This statement leaves unanswered the question: relevant to what? While *Lockett [v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) ], supra, answers this question at least in part—making it clear that a State cannot take out of the realm of relevant sentencing considerations the questions of the defendant's "character," "record," or the "circumstances of the offense"—*Lockett* does not hold that the State has no role in structuring or giving shape to the jury's consideration of these mitigating factors. *Franklin v. Lynaugh*, 487 U.S. at 179, 108 S.Ct. at 2330. [citations omitted].

The *Franklin* plurality recognized a relevance requirement to evidence bearing on the jury's mitigation determination.

■ Indeed, Justice O'Connor provides further guidance to the issue of relevancy by

placing a limit on the categories of evidence which are conceivably mitigating. She provides a prism with which to determine the relevance of proposed mitigating evidence: the culpability of the defendant. As she explained in *Franklin, supra,* and later in *Penry v. Lynaugh,* 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989):

> [E]vidence about the defendant's background and character is relevant because of the belief, long held in society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, *may be less culpable than defendants who have no such excuse. Franklin,* supra, 487 U.S. at 184, 108 S.Ct. at 2333. [citing *California v. Brown,* 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987) ] [emphasis added].

To Justice O'Connor, the evidence is relevant because it relates to the moral culpability of a defendant's act. By this logic, if evidence has no relation to a defendant's moral culpability for the charged crime, then it is irrelevant to mitigation.

In our view, photographs of appellant which depict a cheerful early childhood are irrelevant to appellant's moral blameworthiness for the commission of a violent double-murder because such evidence has no relationship to appellant's conduct in those murders. That appellant was once a child does not diminish his moral culpability for the act of murder. Thus, we find no abuse of discretion on the part of the trial court in refusing to admit these photographs. Point of error eighteen is overruled.

■ In point five, appellant claims the trial court erred when it admitted evidence, during the punishment phase of the trial, that appellant would be eligible for unaccompanied emergency furlough from prison if he were assessed a life sentence for the offense of capital murder. The State elicited this evidence from Roy Smithy, who was employed by the Huntsville prison:

> Q: If an inmate is in prison and behaves himself for a certain period of time, even if he has been convicted of capital murder, and of course, is there on just a life sentence, is there an opportunity for him to get furloughed?
>
> A: If he obtains SAT status, state approved trustee 3 status, then he is eligible for furloughs.
>
> Q: Just exactly what does a furlough mean?
>
> A: You have different types. You have emergency furloughs. You have other—.
>
> DEFENSE COUNSEL: Your Honor, could I have a running objection to all of this?
>
> THE COURT: Just a moment. Approach the bench, please.
>
> (Counsel went to the bench for an off-the-record conference; then the reporter was called to the bench, and the following proceedings were had:)
>
> DEFENSE COUNSEL: Judge, to allow her to go into this stuff and not let me allude to—let the jury know he is going to stay locked up for thirty-five years is a gross miscarriage of justice.
>
> THE COURT: *I don't know where your objection is in there.* I understand what your previous objection was. She has been admonished.
>
> DEFENSE COUNSEL: I object to any further questions along this line.
>
> THE COURT: I am going to allow her to complete her line of questioning. That is all I am going to say.
>
> Q: I am not even sure I remember what the last question was.
>
> DEFENSE COUNSEL: Talking about furlough.
>
> Q: Thank you. I think I had asked you what is a furlough?
>
> A: A furlough is when an inmate is allowed to leave the prison unit unescorted to attend whatever reason it is that he has requested to leave the unit, things such as funeral, family emergency and things of that sort where he, in essence, signs a piece of paper that says that he is going to be released a certain time and that he will go to wherever this emergency is and that he promises that he will be back and turn himself back into the unit.
>
> Q: Like just for the weekend or something or for a day or so?

A: Yes, ma'am. It may not be just a weekend. It could very well be for a three day period in the middle of the week.

Q: Depending on the circumstances?

A: Yes, ma'am.

This discussion encompasses the entire testimony regarding furlough.

We do not have to address the merits of appellant's contention because he failed to object to the line of questioning with ample specificity to notify the trial court of his contention. *See Zillender v. State,* 557 S.W.2d 515, 517 (Tex.Crim.App.1977). This Court has identified the prerequisites to an effective objection respecting the admissibility of evidence. As we held in *Lankston v. State,* 827 S.W.2d 907, 909 (Tex.Crim.App. 1992):

> As regards specificity, all a party has to do to avoid the forfeiture of a complaint on appeal is to let the trial judge know what he wants, why he thinks himself entitled to it, and to do so clearly enough for the judge to understand him at a time when the trial court is in a proper position to do something about it. Of course, when it seems from context that a party failed effectively to communicate his desire, then reviewing courts should not hesitate to hold that appellate complaints arising from the event have been lost.

In the instant case, appellant objected only to the trial court's decision to preclude issues of parole eligibility from the trial; appellant did not actually object to the State's question regarding emergency furlough.

Indeed, the trial court flatly told appellant that it did not comprehend the nature of appellant's objection. Rather than rephrasing the objection in a way that the trial court could fathom, appellant lodged another nonspecific objection. Appellant failed to effectively communicate his objection. Appellant then declined to rephrase it when the trial court informed him that it did not understand his objection. We therefore hold that appellant's complaint regarding the State's questioning is waived for failure to object with specificity. Point of error five is overruled.

In point six, appellant again contends error resulting from the admission of evidence with respect to unescorted emergency furlough. In this point, however, appellant claims the trial court erred when it overruled appellant's motion for new trial based upon the admission of such evidence. As we held in point five, appellant waived his objection to evidence of unescorted emergency furlough. Appellant, by failing to object correctly, waived his right to complain of the admission of this evidence. Hence, the admission of evidence regarding unescorted emergency furlough could not form the basis of a motion for new trial. Point of error six is overruled.

In point seven, appellant again contends error resulting from the admission of evidence with respect to unescorted emergency furlough. However, in this point, appellant claims the trial court erred when it overruled his requested jury instruction at punishment that the jury not consider the possibility of furlough during deliberations. Appellant is again attempting to avoid the consequence of his procedural default regarding emergency furlough. Appellant failed to object to, or request the court to limit, the jury's consideration of this evidence. Indeed, appellant also failed to request that the trial court strike the evidence at the time it was offered, waiting until the jury charge was prepared.

The motion to strike is itself subject to a requirement of timeliness. *See* S. Goode, et al., *Guide to the Texas Rules of Evidence: Civil and Criminal* § 103.2 at 18 (2nd ed. 1993). For an objection to be "timely", a party must invoke it as soon as the ground for it becomes manifest. *Id.* In the case at bar, the basis for a motion to strike became manifest as soon as the State elicited the testimony regarding emergency furlough. Yet, appellant failed to request that the jury be instructed not to consider the evidence when it was elicited. The motion to strike, in the guise of a requested jury instruction, was untimely. The trial court therefore did not err when it overruled appellant's requested instruction. Point of error seven is overruled.

■ In point eight, appellant avers that the trial court erred when it overruled his requested jury instruction regarding the minimum time served on a life sentence before parole eligibility. At the outset we note, that this Court has considered this argument in prior cases and ruled unfavorably to appellant. *Smith; Broxton, supra.* Appellant, however, contends that the parole instruction became necessary when evidence respecting unescorted emergency furlough was introduced to the jury:

> The trial court erred in allowing the jury to consider testimony regarding the procedures applicable to discretionary prison release. This is the type of evidence which courts have consistently ruled inadmissible and which the legislature would still keep from jury deliberation.

The essence of appellant's argument is that *he* should be permitted to notify the jury regarding procedures surrounding discretionary prison release if *the State* is permitted to do so. However, the jury was authorized to consider evidence of unescorted emergency furlough because appellant failed to object properly to its admission. That the jury could consider emergency furlough does not necessitate that it be informed of the factors surrounding parole eligibility. This is because the jury's knowledge of whether appellant was eligible for parole in thirty-five years does not serve to rebut the possibility that appellant could be released on emergency furlough within two days of entering prison. The two issues are unrelated. Hence, the trial court did not err when it refused to give a parole instruction. Point of error eight is overruled.

■ In point thirteen, appellant contends that Article 37.071 is unconstitutional because it fails to place the burden of proof, with respect to mitigation, upon the State. Appellant's argument follows:

> [Article 37.071] limits and inhibits the jury's consideration of mitigating evidence in violation of the Eighth and Fourteenth Amendments of the United States Constitution. Said infirmity results by the statute's failure to place the burden of proof on the State for the mitigation special issue as mandated by Art. 37.071(e).

In cases where mitigating evidence is presented, all that is constitutionally required is a vehicle by which the jury may give mitigating effect to appellant's evidence. *Penry v. Lynaugh, supra; Walton v. State,* 497 U.S. 639, 649–50, 110 S.Ct. 3047, 3055, 111 L.Ed.2d 511 (1990); *Barnes v. State* 876 S.W.2d 316, 330 (Tex.Crim.App.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 174, 130 L.Ed.2d 110 (1994). No burden of proof exists for either the State or defendant to prove or disprove the mitigation question. *Id; Penry v. State,* 903 S.W.2d 715, 765 (Tex.Crim.App.1995). Point of error thirteen is overruled.

■ In point fourteen, appellant claims the trial court erred when it refused to give a punishment instruction which accurately placed the burden of proof as to mitigation on the State. As we held in the prior point of error, no burden of proof exists for either the State or defendant to prove or disprove the mitigating question. *Barnes v. State, supra.* Hence, the trial court did not err when it overruled appellant's erroneous request to instruct the jury that the burden of proof was on the State to prove mitigation. Point of error fourteen is overruled.

■ In point sixteen, appellant contends the trial court erred when it overruled his objection to the punishment charge. In his objection, appellant claimed that the charge failed to identify and define which factors presented by the evidence could be considered mitigating. Indeed, appellant bases this contention upon the notion that there are some factors which are mitigating as a matter of law.

There is no evidence that must be viewed by a juror as having a definitive mitigating effect, per se. *Robertson v. State,* 871 S.W.2d 701, 712 (Tex.Crim.App.1994), *cert. denied,* — U.S. ——, 115 S.Ct. 155, 130 L.Ed.2d 94 (1994). As we have previously held: "[Appellant] is not entitled to jury instructions specifically informing the jury that certain evidence may be considered or how it may be applied." *Id.* Hence, appellant's request for an instruction informing the jury that certain evidence was mitigating,

per se, was properly denied. Point of error sixteen is overruled.

■ In point fifteen, appellant claims Article 37.071 violates the Eighth and Fourteenth Amendments to the U.S. Constitution because it fails to direct or inform the jury regarding the nature of mitigating or aggravating evidence that would call for or against the application of the death penalty. As we held in *Robertson, supra:*

> Each juror may or may not believe certain evidence is mitigating; however, the constitution only requires that where a juror believes there is relevant mitigating evidence, that juror must have a vehicle to give his or her reasoned moral response to such evidence.

*Robertson v. State*, 871 S.W.2d at 712. (citing *Johnson v. Texas*, 509 U.S. 350, 113 S.Ct. 2658, 125 L.Ed.2d 290 (1993)). The Federal Constitution does not require trial courts to instruct juries regarding how they should consider, or apply what they may or may not deem mitigating evidence. Point of error fifteen is overruled.

In point twelve, appellant claims the trial court erred when it overruled his contention that Article 37.071 was unconstitutional, in violation of the Eighth and Fourteenth amendments to the U.S. constitution. Appellant specifically asserts that an untrained jury was incapable of predicting whether a defendant might commit future acts of violence which would constitute a continuing threat to society. Appellant, therefore, argues that Article 37.071 fails "to meet the constitutional requirement that the death penalty not be arbitrarily or capriciously rendered." This Court addressed and rejected appellant's argument in *Lackey v. State*, 819 S.W.2d 111, 121 (Tex.Crim.App.1989). Point of error twelve is overruled.

Having found no reversible error, we AFFIRM the judgment of the trial court.

BAIRD, J., concurring with the following note: I am sympathetic to the views expressed in Judge Overstreet's well reasoned dissent. *Post,* 934 S.W.2d at 131 (Overstreet, J., dissenting). However, for the reasons stated in *Smith v. State*, 898 S.W.2d 838, 856 (Tex.Crim.App.1995) (Baird, J., concurring), and because the Supreme Court has not revisited its opinion in *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994), I am constrained to join only the judgment of the Court.

MALONEY and MEYERS, JJ., concur in the result.

CLINTON, Judge, dissenting.

I dissent to the majority's dogged determination to give the slip to *Simmons v. South Carolina*, 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). In my view a requirement that trial courts inform juries about the earliest possible release date attached to a life sentence obtains if a defendant has shown other evidence that, in combination with the information about release dates, tends to show that a capital defendant will not be a future danger to society. *Willingham v. State*, 897 S.W.2d 351, 359 (Tex.Cr. App.1995) (Clinton, J., concurring). Unlike most appellants raising *Simmons* claims, appellant here offered precisely such evidence at trial. During punishment, appellant adduced uncontroverted expert testimony from a psychologist to the effect that his tendency to violence would be greatly mollified by the time he reached the age of sixty-three. Of course the full significance of this testimony will be lost on a jury that does not know that appellant cannot be released into society until at least that age. It escapes me how this Court can gainsay the force of the reasoning in *Simmons* when presented with such evidence, evidence that in my view makes information about the earliest potential release date available to appellant should he be sentenced to life imprisonment unquestionably relevant to future dangerousness.[1]

---

1. My resolution of this point of error casts doubt on the propriety of the trial court's refusal to permit appellant to question members of the venire panel on the issue of earliest possible release dates. But if this is indeed voir dire error, it is no doubt error affecting punishment only and thus requires a remand only for a new punishment hearing. See Article 44.29(c); *Ransom v. State*, 920 S.W.2d 288 (Tex.Cr.App.1996). As my resolution of the predicate issue would already require the Court to remand for a new

I also write to express disagreement with the majority's discussion of appellant's eighteenth point of error. At punishment, the trial court refused to admit eleven photographs presented by appellant depicting him at various points throughout his childhood. The majority affirmed the trial court's decision on grounds that I find unnecessary, inadequately discussed, and simply wrong.

The majority states that mitigating evidence must relate to a defendant's personal moral culpability. It thus holds that the trial court was correct in refusing to admit the photographs because they do not reflect upon appellant's moral culpability. As I have iterated previously, I do not believe that Supreme Court caselaw answers this very difficult question as the majority, in a few brief paragraphs, does.

By way of the majority's discussion in this regard we essentially revisit the nexus requirement, *Lackey v. State*, 819 S.W.2d 111 (Tex.Cr.App.1991) (On appellant's motion for rehearing), in a new setting. This court-created admissibility threshold is again urged by the majority, though not in the precise terms. In my opinion, the fundamental problem with such a relevancy requirement persists. *Lackey*, 819 S.W.2d at 136 (Clinton, J., dissenting); *Goss v. State*, 826 S.W.2d 162, 169 (Tex.Cr.App.1992) (Clinton, J., dissenting); see also *Ex parte Bower*, 823 S.W.2d 284, 288–295 (Tex.Cr.App.1991) (Clinton, J., dissenting). By upholding the trial court's exclusion of the eleven photographs on the basis that the photographs do not pertain to appellant's moral culpability, the majority continues to ignore the Supreme Court's jurisprudence to the contrary. For the same reasons I criticized the nexus requirement, I dissent in this cause as well.

To justify its position, the majority has seized on language in *Franklin v. Lynaugh*,

487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988) (plurality opinion), and *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989), that indicates that the appropriate punishment in a capital trial is purely a function of the defendant's personal moral culpability.[2] Op., ante at 125–126. While this language indicates that mitigating evidence is relevant only if it reflects on the moral culpability of the defendant, the comments only appear to be dicta. The Supreme Court has never explicitly arrived at that conclusion in a holding of a majority opinion.

Moreover, other portions of the *Penry* opinion support my long-held belief—based on my reading of the Court's caselaw—that there can be no such limitation on the scope of mitigating evidence. For instance, the Court cited the holding in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), "[t]hat the Eighth and Fourteenth Amendments require that the sentencer 'not be precluded from considering, as a *mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.'" *Id.*, 492 U.S. at 317, 109 S.Ct. at 2946, 106 L.Ed.2d at 277 (emphasis in original) (citation omitted). The Court also cited *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), for the proposition that "[a] State may not by statute preclude the sentencer from considering any mitigating factor ..." *Penry*, 492 U.S. at 318, 109 S.Ct. at 2946, 106 L.Ed.2d at 278. Indeed, as *Penry* noted, our death penalty scheme survived constitutional scrutiny in *Jurek* because this Court "broadly interpreted the second [special issue] ... so as to permit the sentencer to consider *whatever* mitigating circumstances the defendant might be able to offer." *Id.*, 492 U.S. at 317, 109 S.Ct. at 2946,

punishment hearing, however, there is no need to resolve the voir dire question.

**2.** The majority also cites Article 37.071 § 2(f)(4) to support its conclusion. Yet the effect of the jury instruction called for by § 2(f)(4) on the definition of mitigating evidence in § 2(e) presents a problem that has not been resolved by the Court. Article 37.071 § 2(e) arguably allows a much broader range of mitigating evidence than

§ 2(f)(4). Though it has been presented to the Court on prior occasions, the issue has not yet been decided in my opinion. The Court has touched on it, though incompletely and even inconsistently. See *Lawton v. State*, 913 S.W.2d 542, 555–6 (Tex.Cr.App.1995); *McFarland v. State*, 928 S.W.2d 482, 518 (Tex.Cr.App.1996); *Alvarado v. State*, 912 S.W.2d 199, 217 (Tex.Cr. App.1995) (plurality opinion); *Goff v. State*, 931 S.W.2d 537, 555 (Tex.Cr.App., No. 71,404, delivered May 22, 1996) (slip op. at 26).

106 L.Ed.2d at 277 (internal quotations and citations omitted) (emphasis added).

In any event, the Supreme Court has never renounced its decision in *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986). In *Skipper*, the Court held that it violates the Eighth and Fourteenth Amendments for the trial court to refuse to admit evidence of the petitioner's post-arrest, pre-trial good conduct and adjustment during incarceration. The Court arrived at this conclusion even though expressly recognizing that the mitigating effect of the evidence did not derive from its relation to the petitioner's culpability for the offense he committed. Despite language to the contrary in *Penry*, supra, I continue to believe that:

> "the principle of *Skipper* [that proffered evidence does not necessarily have to relate specifically to culpability for the charged crime to be relevant to serve as a valid basis for a sentence less than death] remains intact ... and applies beyond the context of good conduct in jail."

*Lackey*, 819 S.W.2d at 137 (Clinton, J., dissenting).

Accordingly, the photographs adduced by appellant should have been admitted by the trial court, even if the only purpose of their introduction was to solicit the mercy of the jury. The dispensation of mercy is a "fundamental tradition of our system of criminal jurisprudence," and one of the jury's core prerogatives. *Boyd v. State*, 811 S.W.2d 105, 130 n. 5 (Tex.Cr.App.1991) (Clinton, J., dissenting) (citations omitted). The majority is wrong to conclude that the photographs are inadmissible on the rationale that they do not relate to appellant's personal moral culpability. Moreover, the majority decides this intractable, complicated, very important constitutional question with but a wave of a hand and a brushing aside of Supreme Court precedent inconsistent with its holding.

To the short-shrift the majority gives a pair of Supreme Court cases from South Carolina, I dissent.

. OVERSTREET, J., joins.

OVERSTREET, Judge, dissenting.

Appellant's eighth point of error alleges that "the trial court erred in overruling appellant's requested instruction in the jury charge regarding the minimum time served for a life sentence assessed for the offense of capital murder." Point number four asserts that if Article 37.07, V.A.C.C.P. "was properly interpreted as preventing the trial court from fully informing the jury of the statutory sentencing provisions for capital murder, the section violated the due process rights afforded by the Fourteenth Amendment to the United States Constitution and Article I, Sections 13 and 19 of the Texas Constitution." Both points complain about the trial court's refusal to inform the jury that a life sentence after conviction of capital murder statutorily required service of 35 years incarceration before becoming eligible for parole. The majority concludes that "the trial court did not err when it refused to give a parole instruction." *Rhoades v. State*, 934 S.W.2d 113, 128 (Tex.Cr.App.1996). I respectfully disagree and believe that appellant was entitled to his requested instruction informing the jury that he would not be eligible for parole for 35 years if he received a life sentence.

Appellant sought to inform veniremembers about the statutory requirement of 35 years incarceration before becoming eligible for parole, but the trial court refused to allow such and instead granted the State's motion in limine restricting the discussion of such during voir dire. Appellant points out that he presented testimony from a psychologist that the risk level for violence decreases with age and that a 65–year–old inmate's risk level would have gone way down from whatever it may have been before and should approximate that of the general population. He suggests that such testimony had no relevant meaning to the jury on the issue of future dangerousness, nor could it be given any mitigating effect, without the jury's knowledge of the mandatory 35 years.

After the close of evidence at punishment, appellant requested that the jury charge include an instruction informing the jury that he would have to serve a mandatory 35 years

before becoming eligible for parole and objected to the jury charge not including an instruction as to such. The trial court refused to include such an instruction.

The State does not specifically dispute the fact that pursuant to Article 42.18, § 8(b)(2), V.A.C.C.P., had appellant been sentenced to life rather than death for the instant offense he would indeed have been legally required to serve 35 years incarceration before becoming eligible for parole. However, the State asserts that the law prohibits a jury from being informed of the statutorily-mandated minimum amount of time that a person convicted of capital murder, who receives a life sentence, must serve before becoming eligible for parole. However, while Art. 37.07, § 4, V.A.C.C.P., provides for the jury to be informed of various matters as to parole eligibility in non-capital punishment proceedings, by its language it does not even apply to capital punishment proceedings; thus it does not prohibit such information from being provided to juries in capital proceedings. Appellant correctly notes that Art. 37.07, § 4 does not prohibit the trial court from including information about the requirement of serving 35 calendar years before becoming eligible for parole in the punishment jury charge of a capital murder case, but rather requires an appropriate instruction in non-capital felony cases.

### A. Texas cases

First, I shall examine Texas cases, prior to *Smith v. State*, 898 S.W.2d 838 (Tex.Cr.App. 1995) (plurality opinion), *cert. denied*, 510 U.S. 997, 116 S.Ct. 131, 133 L.Ed.2d 80 (1995), on this and related issues. This Court has held that a trial court properly refused to instruct the jury at the punishment stage of a capital murder trial on the parole laws in Texas. *Elliott v. State*, 858 S.W.2d 478, 490 (Tex.Cr.App.1993), *cert. denied*, 510 U.S. 997, 114 S.Ct. 563, 126 L.Ed.2d 463 (1993); *see also Hughes v. State*, 897 S.W.2d 285, 300–01 (Tex.Cr.App.1994).

In *Elliott* the defendant claimed the denial of the instruction violated the Eighth and Fourteenth Amendments to the United States Constitution, relying on *California v. Ramos*, 463 U.S. 992, 103 S.Ct. 3446, 77 L.Ed.2d 1171 (1983), and *King v. Lynaugh*, 828 F.2d 257 (5th Cir.1987), *vacated in part*, 850 F.2d 1055 (5th Cir.1988)(en banc). We observed that neither this Court nor the Fifth Circuit had interpreted *California v. Ramos* as requiring an instruction on parole laws in the punishment phase of a capital case. *Elliott*, 858 S.W.2d at 490. While recognizing that Fifth Circuit opinions have no precedential value for this Court, we were persuaded by the en banc opinion in *King v. Lynaugh* which found no federal constitutional requirement for such an instruction.[1] *Elliott*, 858 S.W.2d at 490. This Court quoted from the Fifth Circuit's en banc opinion stating that in *California v. Ramos* the Supreme Court determined that a jury instruction on a capital defendant's eligibility for parole or commutation of sentence does not raise a constitutional issue. *Elliott*, 858 S.W.2d at 490, citing *King v. Lynaugh*, 850 F.2d at 1061. Additionally, we determined that an instruction on parole in a capital case would violate Article 4, section 11, of the Texas Constitution. *Elliott*, 858 S.W.2d at 489, n. 7; *see also Garcia v. State*, 887 S.W.2d 846, 860 (Tex.Cr.App.1994), *cert denied*, —— U.S. ——, 115 S.Ct. 1317, 131 L.Ed.2d 198 (1995).

Even before *Elliott* this Court consistently rejected arguments that the trial court should instruct the jury about parole in the context of a life sentence for capital murder. *Boyd v. State*, 811 S.W.2d 105, 130 (Tex.Cr. App.1991), *cert. denied*, 502 U.S. 971, 112 S.Ct. 448, 116 L.Ed.2d 466 (1991); *Knox v. State*, 744 S.W.2d 53, 62–64 (Tex.Cr.App. 1987), *cert. denied*, 486 U.S. 1061, 108 S.Ct. 2834, 100 L.Ed.2d 934 (1988); *Andrade v. State*, 700 S.W.2d 585, 587–88 (Tex.Cr.App. 1985), *cert. denied*, 475 U.S. 1112, 106 S.Ct. 1524, 89 L.Ed.2d 921 (1986).

---

**1.** Actually, in *King v. Lynaugh* the en banc court did not decide the issue of whether a parole instruction should have been given. The en banc court held that this issue was procedurally barred because King did not request such a charge at trial. *King v. Lynaugh*, 850 F.2d at 1056 n. 1. The issue addressed by the en banc court was whether King should have been allowed to voir dire the jury on the twenty-year requirement for parole eligibility under a life sentence for capital murder. *Id.* at 1058.

Similarly we have held that a defendant in a capital case is not permitted to present evidence of parole procedures applicable to life sentences for capital murder. *Jones v. State,* 843 S.W.2d 487, 495 (Tex.Cr.App.1992). *See also Stoker v. State,* 788 S.W.2d 1, 16 (Tex.Cr.App.1989), *cert. denied,* 498 U.S. 951, 111 S.Ct. 371, 112 L.Ed.2d 333 (1990) (no error in failing to appoint expert to testify on issue of parole in a capital case). In *Jones* the defendant sought to introduce evidence that he would be confined a minimum of twenty years.[2] Jones argued that the jury should be aware of the length of time he would have to be confined in prison so the jury could intelligently decide whether he was a continuing threat to society.[3] This Court stated that a jury should not consider parole during punishment deliberation in a capital murder case. *Jones,* 843 S.W.2d at 495. Jones also attempted to present expert testimony showing he would never be paroled, arguing that he would never be a threat to society. We observed that "society" includes prison inmates as well as free citizens, so the length of time a person remains incarcerated was not relevant to the special issue on future dangerousness. *Id.*

We have held that a trial court does not err in a capital murder trial by instructing the jury not to consider how long a defendant would be required to serve to satisfy a life sentence, because parole is not a proper consideration for the jury's deliberations at punishment. *Ramirez v. State,* 815 S.W.2d 636, 653 (Tex.Cr.App.1991); *Williams v. State,* 668 S.W.2d 692, 701 (Tex.Cr.App.1983), *cert. denied,* 466 U.S. 954, 104 S.Ct. 2161, 80 L.Ed.2d 545 (1984).

In voir dire, prospective jurors may not be told about the specifics of parole law relating to life sentences for capital murder. *Boyd,* 811 S.W.2d at 118–19. A potential juror who is unable to disregard parole in determining the special issues is challengeable for cause. *Felder v. State,* 758 S.W.2d 760, 762–67 (Tex. Cr.App.1988).

The constant in these Texas cases has been that parole is not a proper matter for consideration in the jury's deliberation in the punishment stage of a capital murder trial. This was due primarily to two reasons: (1) prior to the 1989 amendment of Art. IV, § 11 of the Texas Constitution, parole was never a proper matter for the jury to consider in Texas[4]; and (2) until recently, the United States Supreme Court had never held that there was a federal constitutional requirement that the jury ever be given any information about parole. *See California v. Ramos, supra.*

### B. *Simmons v. South Carolina*

In a supplemental brief appellant points out that the Supreme Court recently issued its opinion in *Simmons v. South Carolina,* 512 U.S. 154, 114 S.Ct. 2187, 129 L.Ed.2d 133 (1994). Appellant argues that under *Simmons* the failure to inform the jury of when he would be eligible for parole violated the Due Process Clause and the Eighth Amendment of the United States Constitution.

In *Simmons,* because of prior convictions for violent crimes, the defendant would have been ineligible for parole if he were given a life sentence. *Simmons,* 512 U.S. at —— n. 2, 114 S.Ct. at 2191 n. 2, 129 L.Ed.2d at 139 n. 2. Before jury selection, the trial court granted the prosecutor's motion, over Simmons' objection, and ordered the defense not to voir dire the venire about parole or even mention the subject of parole. In the punishment phase, the prosecutor asked the jury to consider Simmons' future dangerousness. In response, Simmons presented evidence

---

**2.** *See* former Art. 42.18, § 8(b), V.A.C.C.P.

**3.** *See* former Art. 37.071(b)(2), V.A.C.C.P., now Arts. 37.0711, § 3(b)(2), and 37.071, § 2(b)(1) ("whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society").

**4.** "The Legislature shall have authority to enact parole laws and laws that require or permit courts to inform juries about the effect of good conduct time and eligibility for parole or manda-tory supervision on the period of incarceration served by a defendant convicted of a criminal offense." Tex. Const., Art. IV, § 11(a). As a result of the 1989 amendment to Art. IV, § 11(a), the Legislature enacted Art. 37.07, § 4, V.A.C.C.P., which provides for such instruction by the courts, but does not mention capital cases. *See Boyd,* 811 S.W.2d at 121; *Felder,* 758 S.W.2d at 762 (both cases construing former Art. 37.07, § 4).

that he would not commit acts of violence once he was isolated in a prison setting. Simmons' attorney asked the trial court to instruct the jury that Simmons would be ineligible for parole and, if sentenced to life imprisonment, he in actuality would be sentenced to imprisonment for the balance of his natural life.

Outside the presence of the jury, Simmons presented evidence showing he was ineligible for parole. There was evidence from Simmons and the prosecution about furloughs and early release programs. Simmons offered results of a survey showing that few people in South Carolina believed that a person sentenced to life imprisonment actually would spend the rest of his life in prison; that almost half believed a convicted murderer might be paroled within twenty years; that almost three-fourths believed a convicted murderer would be released within thirty years; and that more than three-fourths said that if they had to decide a sentence in a capital case, the amount of time the defendant actually would have to spend in prison would be either extremely important or very important in choosing between life and death. The trial court denied Simmons' request for an instruction.

During deliberation the jury sent a note to the judge inquiring about the possibility of parole for a life sentence. Over Simmons' objection the trial court instructed the jury not to consider parole or parole eligibility. The court also informed the jury that life imprisonment and death sentence were to be understood in their plain and ordinary meaning. The jury returned a sentence of death.

The Supreme Court held that when a defendant's future dangerousness is an issue and the defendant is ineligible for parole, due process requires that the jury assessing punishment be told that about the defendant's parole ineligibility.[5] *Simmons*, 512 U.S. at ——, 114 S.Ct. at 2190, 129 L.Ed.2d at 138. "The Due Process Clause does not allow the execution of a person 'on the basis of information which he had no opportunity to deny

or explain.'" *Simmons*, 512 U.S. at ——, 114 S.Ct. at 2192, 129 L.Ed.2d at 141, citing *Gardner v. Florida*, 430 U.S. 349, 362, 97 S.Ct. 1197, 1207, 51 L.Ed.2d 393 (1977). The Court observed that the jury may have believed Simmons could be released on parole if he were not executed. The Court noted:

> To the extent this misunderstanding pervaded the jury's deliberations, it had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration. This grievous misperception was encouraged by the trial court's refusal to provide the jury with accurate information regarding petitioner's parole ineligibility, and by the State's repeated suggestion that petitioner would pose a future danger to society if he were not executed.... The State thus succeeded in securing a death sentence on the ground, at least in part, of petitioner's future dangerousness, while at the same time concealing from the sentencing jury the true meaning of its non-capital sentencing alternative, namely, that life imprisonment meant life without parole. We think it is clear that the State denied petitioner due process.

*Simmons*, 512 U.S. at ——, 114 S.Ct. at 2193, 129 L.Ed.2d at 141. The Court further observed:

> [P]etitioner was prevented from rebutting information that the sentencing authority considered, and upon which it may have relied, in imposing the sentence of death. The State raised the specter of petitioner's future dangerousness generally, but then thwarted all efforts by petitioner to demonstrate that, contrary to the prosecutor's intimations, he never would be released on parole and thus, in his view, would not pose a future danger to society. The logic and effectiveness of petitioner's argument naturally depended on the fact that he was legally ineligible for parole and thus would remain in prison if afforded a life sentence. Petitioner's efforts to focus the jury's attention on the question whether, in prison,

---

**5.** The Supreme Court declined to decide whether appellant's rights under the Eighth Amendment were also violated. *Simmons*, 512 U.S. at —— n. 4, 114 S.Ct. at 2193 n. 4, 129 L.Ed.2d at 141 n.

4. *But see Simmons*, 512 U.S. at ——, 114 S.Ct. at 2198, 129 L.Ed.2d at 147 (Souter, J., concurring).

he would be a future danger were futile, as he repeatedly was denied any opportunity to inform the jury that he never would be released on parole. The jury was left to speculate about petitioner's parole eligibility when evaluating petitioner's future dangerousness, and was denied a straight answer about petitioner's parole eligibility even when it was requested.

*Simmons*, 512 U.S. at ——–——, 114 S.Ct. at 2194–95, 129 L.Ed.2d at 143–44 (footnote omitted).

The Supreme Court observed in *Simmons* that "prosecutors in South Carolina, like those in other States that impose the death penalty, frequently emphasize a defendant's future dangerousness in their evidence and argument at the sentencing phase; they urge the jury to sentence the defendant to death so that he will not be a danger to the public if released from prison." *Simmons*, 512 U.S. at ——, 114 S.Ct. at 2193, 129 L.Ed.2d at 142, citing Eiseberg & Wells, "Deadly Confusion: Juror Instructions in Capital Cases," 79 Cornell L.Rev. 1, 4 (1993). Moreover, "[i]n assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant. Holding all other factors constant, it is entirely reasonable for a sentencing jury to view a defendant who is eligible for parole as a greater threat to society than a defendant who is not. Indeed, there may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he never will be released on parole." *Simmons*, 512 U.S. at ——, 114 S.Ct. at 2194, 129 L.Ed.2d at 142.

The Supreme Court noted in *Simmons* that the State may still argue that a parole ineligible defendant would be a future danger to others in prison, "[b]ut the State may not mislead the jury by concealing accurate information about the defendant's parole ineligibility. The Due Process Clause will not tolerate placing a capital defendant in a straitjacket by barring him from rebutting the prosecution's arguments of future dangerousness with the fact that he is ineligible for parole under State law." *Simmons*, 512 U.S. at ——–—— n. 5, 114 S.Ct. at 2194–95 n. 5, 129 L.Ed.2d at 143–44 n. 5.

South Carolina argued in *Simmons* that there was no statutory prohibition of Simmons' eventual release into society and that he could be released through legislative reform, commutation, and clemency. *Simmons*, 512 U.S. at ——, 114 S.Ct. at 2195, 129 L.Ed.2d at 144. The Court rejected this argument because the instruction sought by Simmons was legally accurate and was certainly more accurate than no instruction at all. *Simmons*, 512 U.S. at ——, 114 S.Ct. at 2195, 129 L.Ed.2d at 144.

The Court distinguished *Simmons* from *California v. Ramos*. The Court explained that *Ramos* indicates the Supreme Court generally defers to a State's determination about what parole information should be provided to a jury. The Court continued:

But if the State rests its case for imposing the death penalty at least in part on the premise that the defendant will be dangerous in the future, the fact that the alternative sentence to death is life without parole will necessarily undercut the State's argument regarding the threat the defendant poses to society. Because truthful information of parole ineligibility allows the defendant to "deny or explain" the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention by way of argument by defense counsel or an instruction from the court.

*Simmons*, 512 U.S. at ——, 114 S.Ct. at 2196, 129 L.Ed.2d at 145–46.

Consequently, the Supreme Court found Simmons' right to due process was violated because his future dangerousness was at issue but he was not allowed to inform the jury of his parole ineligibility. *Simmons*, 512 U.S. at ——, 114 S.Ct. at 2198, 129 L.Ed.2d at 147.

### C. Applicability of *Simmons* to Texas Capital Punishment Scheme

#### i. Statutes

In Texas, the jury must answer the following special issue:

Whether there is a probability that the defendant would commit criminal acts of

violence that would constitute a continuing threat to society.

Art. 37.071, § 2(b)(1), V.A.C.C.P.[6] Under the statute in effect for the date of this offense:

> If a prisoner is serving a life sentence for a capital felony, the prisoner is not eligible for release on parole until the actual calendar time the prisoner has served, without consideration of good conduct time, equals 35 calendar years.

Former Art. 42.18, § 8(b)(2), V.A.C.C.P.[7]

### ii. Discussion of Texas Capital Sentencing in *Simmons*

In *Simmons* the Supreme Court noted that Texas does not have a life-without-parole sentencing alternative to capital punishment. *Simmons*, 512 U.S. at —— n. 8, 114 S.Ct. at 2196 n. 8, 129 L.Ed.2d at 145 n. 8. The Court said, "In a State in which parole is available, how the jury's knowledge of parole availability will affect the decision whether or not to impose the death penalty is speculative, and we shall not lightly second-guess a decision whether or not to inform a jury of information regarding parole." *Simmons*, 512 U.S. at ——, 114 S.Ct. at 2196, 129 L.Ed.2d at 145. Justice O'Connor's concurring opinion observed that in a State in which parole is available there is no constitutional requirement that the jury be informed about the parole law. *Simmons*, 512 U.S. at ——, 114 S.Ct. at 2200, 129 L.Ed.2d at 150.[8]

### iii. "Society" under the Texas Special Issue

The Supreme Court has observed that "the question of a defendant's likelihood of injuring others in prison is precisely the question posed by the second Texas Special Issue." *Franklin v. Lynaugh*, 487 U.S. 164, 169 n. 9, 108 S.Ct. 2320, 2330 n. 9, 101 L.Ed.2d 155, 169 n. 9 (1988). According to Justice O'Connor, a Texas capital sentencing jury may give mitigating effect to evidence of the lack of any prison disciplinary record, as this is evidence that the defendant can exist in the highly structured environment of a prison without endangering others. *Franklin v. Lynaugh*, 487 U.S. at 186, 108 S.Ct. at 2333–34, 101 L.Ed.2d at 174 (O'Connor, J., concurring). However, this is only one facet of the term "society" in the special issue.

This Court has examined the meaning of "society" as used in the special issue in several cases. *See, e.g., Rougeau v. State*, 738 S.W.2d 651 (Tex.Cr.App.1987), *cert. denied*, 485 U.S. 1029, 108 S.Ct. 1586, 99 L.Ed.2d 901 (1988), *overruled on other grounds, Harris v. State*, 784 S.W.2d 5 (1989). The defendant in *Rougeau* contended the prosecutor was improperly allowed to comment that society within the meaning of the special issue in-

---

**6.** The offense in this case occurred on September 13, 1991.

**7.** The minimum amount of time a person serving a life sentence for capital murder must serve before becoming eligible for parole has evolved from twenty (20) years, to fifteen (15) years, to thirty-five (35) years, and to forty (40) years. See Act 1985, ch. 427, 1985 Tex. Gen. Laws 1531; Act 1987, ch. 384, 1987 Tex. Gen. Laws 1887; Act 1991, ch. 652, 1991 Tex. Gen. Laws 2394; Act 1993, ch. 900, 1993 Tex. Gen. Laws 3586.

**8.** Of course, the Supreme Court in *Simmons* was not concerned with a situation in which a defendant was eligible for parole, albeit after serving a substantial period of time. The Supreme Court remarked it would not lightly second-guess a state's decision whether or not a jury should be informed about parole. The Court did not opine that the United States Constitution did not require the jury to be provided with parole eligibility information.

If there were a bright-line rule that such information is available only if the sole alternative to death were life without parole, then several questions would be raised. What of a sentencing scheme in which there are three alternatives: death; life without parole; and life with parole, in which the precise date of parole eligibility would be relevant? See *Simmons*, 512 U.S. at ——, 114 S.Ct. at 2202, 129 L.Ed.2d at 152 (Scalia, J., dissenting). Suppose a state wished to provide assurance that capital murder prisoners serving life sentences would never be released on parole, but did not want to have the jury instructed on that matter. Could the state accomplish this by requiring such a prisoner to serve ninety-nine years before attaining parole eligibility? If a defendant is sixty years old and would have to serve forty years before being eligible for parole, could the jury constitutionally be kept from knowing the unlikelihood that he could ever be released on parole, even though the defendant might argue this is tantamount to life without parole?

These questions are rhetorical, but they underscore the ambivalence of a bright-line rule.

cludes prison society. We stated that a juror is free to give the term "society" the meaning that is ordinarily acceptable in common language. *Id.* at 660. This Court held that "society" includes the penitentiary, and the prosecutor properly attempted to learn whether prospective jurors would exclude from "society" inmates and non-inmates within the Texas Department of Corrections. *Id.* In this context we observed, "It is obvious to us that in deciding whether to answer the second special issue in the negative the jury would clearly focus its attention on the 'society' that would exist for the defendant and *that* 'society' would be the 'society' that is within the Texas Department of Corrections." *Id.* (emphasis in original). *See also Boyd,* 811 S.W.2d at 118 n. 12.

In another case, the defendant contended the prosecutor's argument, that the defendant would commit another murder, was a comment that the defendant would be paroled at some point. *Sterling v. State,* 830 S.W.2d 114 (Tex.Cr.App.1992), *cert. denied,* 506 U.S. 1035, 113 S.Ct. 816, 121 L.Ed.2d 688 (1992). This Court held that the argument did not necessarily imply that the defendant would be paroled, but that he would commit another murder in prison. *Id.* at 120–21. However, we noted that the term "society" as used in the special issue includes both inmate and non-inmate populations. *Id.* at 120 n. 5. *See also Boyd,* 811 S.W.2d at 121 ("Appellant fails to cite us to a single case which arguably supports his theory that a potential juror's 'view is supposed to be that a defendant sentenced to life will serve the rest of his life in prison.'").

" '[S]ociety' includes not only free citizens but also inmates in the penitentiary." *Jones,* 843 S.W.2d at 495. Under the special issue, the State must show the defendant "would, more likely than not, commit violent criminal acts in the future so as to constitute a continuing threat to society *whether in or out of prison.*" *Muniz v. State,* 851 S.W.2d 238, 250 (Tex.Cr.App.1993) (emphasis added), *cert. denied,* 510 U.S. 837, 114 S.Ct. 116, 126 L.Ed.2d 82 (1993).

**iv. Application of *Simmons'* Rationale to Texas Capital Sentencing Scheme**

There is an obvious distinction between the facts in *Simmons* and in the present case. In *Simmons* the defendant was not eligible for parole under a life sentence, whereas in this case had appellant received a life sentence, he would have been eligible for parole after thirty-five years.[9] However, a review of *Simmons* leads me to conclude that the underlying rationale of that case compels a similar result under our statutory sentencing scheme.

In a capital trial, a defendant is entitled to offer evidence concerning recidivism rates relating to length of incarceration and age of the offender, along with expert opinion through hypothetical questions based on the particular circumstances of the individual defendant. *Matson v. State,* 819 S.W.2d 839, 848–54 (Tex.Cr.App.1991). Rehabilitation is obviously a proper consideration under the pertinent special issue. *Jackson v. State,* 822 S.W.2d 18, 25 (Tex.Cr.App.1990), *cert. denied,* 509 U.S. 921, 113 S.Ct. 3034, 125 L.Ed.2d 722 (1993).

In answering the special issue, a Texas jury must determine whether the defendant would, more likely than not, commit violent criminal acts in the future so as to constitute a continuing threat to society whether in or out of prison. *Muniz,* 851 S.W.2d at 250. "Society" means both free citizens and people in prison. *Jones,* 843 S.W.2d at 495.

Under the facts of a given case, the jury may well believe that a defendant does not pose a threat to prison society due to the regimented environment, but that the defendant may be a future danger to society outside of prison. However, under our previous case law, the jury is not allowed to know that such a defendant would not be released into society outside of prison for a minimum of thirty-five years. This would be particularly useful information if a jury believed a defendant would not be a future danger to society

---

**9.** Another distinction is that in Texas, unlike South Carolina, a jury must answer a special issue about whether there is a probability that a defendant would commit criminal acts of violence that would constitute a continuing threat to society. Thus, future dangerousness is always an issue in a Texas capital case.

within prison, would currently present a threat to society outside of prison if he were eligible for release anytime soon, but could be rehabilitated in prison to where he would not be a danger to society outside of prison thirty-five years in the future. Without knowing that a capital murderer sentenced to life is ineligible for parole until serving at least thirty-five years, the jury does not have all of the relevant information available on the issue. "In assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant." *Simmons,* 512 U.S. at ———, 114 S.Ct. at 2194, 129 L.Ed.2d at 142.

When the prosecution relies on the future dangerousness of the defendant to seek the death penalty, elemental due process requires that the defendant be given an opportunity to introduce evidence on this point. *Skipper v. South Carolina,* 476 U.S. 1, 5 n. 1, 106 S.Ct. 1669, 1671 n. 1, 90 L.Ed.2d 1, 7 n. 1 (1986). In *Skipper* the Court also found an Eighth Amendment requirement. "[E]vidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating." *Skipper,* 476 U.S. at 5, 106 S.Ct. at 1671, 90 L.Ed.2d at 7. "[A] defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is itself an aspect of his character that is by its nature relevant to the sentencing determination." *Skipper,* 476 U.S. at 7, 106 S.Ct. at 1672, 90 L.Ed.2d at 8. If a rule has "the effect of precluding the defendant from introducing otherwise admissible evidence for the explicit purpose of convincing the jury that he should be spared the death penalty because he would pose no undue danger to his jailers or fellow prisoners and could lead a useful life behind bars if sentenced to life imprisonment, the rule would not pass muster under *Eddings* [*v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) ]." *Skipper,* 476 U.S. at 7, 106 S.Ct. at 1672, 90 L.Ed.2d at 8.

The Texas death penalty statute is constitutional, premised on the jury having all possible relevant information about the individual defendant. *Matson,* 819 S.W.2d at 850, citing *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976). A jury must not be instructed to disregard relevant mitigating evidence. *Matson,* 819 S.W.2d at 850 n. 8, citing *Eddings v. Oklahoma,* 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982). "Clearly then, for the Texas death penalty statutes to meet constitutional muster, the sentencing authority in a capital case must be allowed to consider and give effect to all relevant mitigating evidence." *Matson,* 819 S.W.2d at 851.

It would be difficult at best for a jury to give effect to the type of evidence authorized in *Matson,* rehabilitation and recidivism rates, without knowing that the defendant will remain incarcerated for at least thirty-five years before even being considered for placement back into society outside of prison. The problem associated with this lack of information provided to a jury is exacerbated by general, though not always accurate, knowledge of the existence of parole.

In *Simmons* the Supreme Court reviewed the question of whether the trial court's instruction, that life imprisonment was to be understood in its plain and ordinary meaning, adequately instructed the jury about Simmons' parole ineligibility. The Court capsulized the history of parole and juries in the United States:

It can hardly be questioned that most juries lack accurate information about the precise meaning of "life imprisonment" as defined by the States. For much of our country's history, parole was a mainstay of state and federal sentencing regimes, and every term (whether a term of life or a term of years) in practice was understood to be shorter than the stated term.... [I]t is impossible to ignore "the reality, known to the 'reasonable juror,' that, historically, life-term defendants have been eligible for parole."

An instruction directing juries that life imprisonment should be understood in its "plain and ordinary" meaning does nothing to dispel the misunderstanding reasonable jurors may have about the way in which any particular State defines "life imprisonment." See *Boyde v. California,* 494 U.S. 370, 380, 110 S.Ct. 1190, 1198, 108 L.Ed.2d 316 (1990) (where there is a "reasonable likelihood that the jury has applied the

challenged instruction in a way that prevents the consideration of constitutionally relevant evidence," the defendant is denied due process).

*Simmons,* 512 U.S. at ——, 114 S.Ct. at 2197, 129 L.Ed.2d at 146 (citations omitted).

The Supreme Court addressed South Carolina's argument that the jury was not misled, as the trial court admonished the jury not to consider parole and that parole is not a proper issue for the jury's consideration.

> Far from ensuring that the jury was not misled, however, this instruction actually suggested that parole *was* available but that the jury, for some unstated reason, should be blind to this fact. Undoubtedly, the instruction was confusing and frustrating to the jury, given the arguments by both the prosecution and the defense relating to petitioner's future dangerousness, and the obvious relevance of petitioner's parole ineligibility to the jury's formidable sentencing task. While juries ordinarily are presumed to follow the court's instructions, we have recognized that in some circumstances "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored."

*Simmons,* 512 U.S. at ——, 114 S.Ct. at 2197, 129 L.Ed.2d at 147 (citations omitted).

Although *Simmons* involved the failure to inform jurors that the defendant would not be eligible for parole under a life sentence, a jury in Texas faces a similar dearth of information when it comes to intelligently answering the special issue referencing the probability that a defendant would commit criminal acts of violence that would constitute a continuing threat to society outside of prison.

In Texas, this Court has observed it is common knowledge that from time to time inmates of the Texas Department of Criminal Justice are released on parole. *Felder,* 758 S.W.2d at 762. Experience demonstrates the best likelihood is that a jury will consider the existence of parole. *Arnold v. State,* 786 S.W.2d 295, 300 (Tex.Cr.App.1990), *cert. denied,* 498 U.S. 838, 111 S.Ct. 110, 112 L.Ed.2d 80 (1990). Jurors often succumb to the temptation to consider parole. *Id.* at 311. While jurors conceive of parole, they can, and often do, misperceive its application. "It can hardly be questioned that most juries lack accurate information about the precise meaning of 'life imprisonment.'" *Simmons,* 512 U.S. at ——, 114 S.Ct. at 2197, 129 L.Ed.2d at 146. Portions of the voir dire involving several veniremembers in the present case are illustrative.[10]

> VENIREMEMBER: Life is life: correct? It's not what we hear on TV?

The trial court told the panel that it would instruct them not to consider the issue of parole in making their decision.

> PROSECUTOR: Does anything pop into your mind that is important, or I mean why that must be, why we need the death penalty, if we do?
>
> VENIREMEMBER: I just—there is so much about people that are turned loose after serving such a short period of time in a prison for minor crimes and then go out and commit murder, and it's just really scary to hear things like that, that they are put away for not so serious crimes and then turn around and do much worse crimes after being just sentenced for such a short period, or not sentenced but allowed to serve such a short period of time, and if people like that can do—go to that point, people that have already committed horrendous crimes, it just seems a little scary that they might do the same thing again, or be a hazard to society.

Another veniremember discussed the matter as follows:

> DEFENSE COUNSEL: The way the question reads: Do you agree or disagree that life imprisonment is more effective than capital punishment? And you disagreed with that statement. . . . Could you share with me why?
>
> VENIREMEMBER: I guess the reason I answered it in that response was that basi-

---

10. These are quoted for illustrative purposes. This is not to suggest that these veniremembers were unqualified.

cally we know that even though they get life imprisonment they are up for parole within ten or twenty years and that life imprisonment doesn't mean life imprisonment. Basically the words don't mean anything.

In response to a veniremember's concern about early release, the trial court responded, "Question relating to leniency within the penal institution or criminal laws, and you mentioned early release. Almost everybody does. That is one of the most popular answers."

VENIREMEMBER: What does life mean? Can they get out in three years or four years with life?

The trial court explained to this veniremember that this was not something that could be considered in the punishment phase.[11] The colloquy continued:

VENIREMEMBER: I don't think I really got an answer.

COURT: You didn't get a correct answer because I can't tell you. All I can tell you is you can't consider it.

Another veniremember was asked about the potential for a person being a continuing threat to society.

VENIREMEMBER: Most of them do. Most of them—I watch the news every night. Early parolees and everything, they get out of jail and they commit another crime the next day.

Another veniremember expressed a problem with a person convicted of a crime who was suddenly released to commit another crime. She asked if that were possible in a capital murder case.

COURT: Well I think it is obvious if somebody is assessed the death penalty you don't get paroled on a death penalty.

VENIREMEMBER: That doesn't seem to be what is happening, though. Or are we not knowing the full story when we hear things?

COURT: You probably don't know the full story, but you aren't paroled on a death penalty. I think that is obvious. I don't think anybody is going to object at this point to my telling you that, which leaves you with the other option, a life sentence.

VENIREMEMBER: And that's the one that you are eligible for parole at some stage perhaps?

COURT: Yes.

This veniremember was told that she would be instructed not to consider parole.

VENIREMEMBER: See I think that is wrong. I think that if—I think that if the sentence I am going to—if the way I vote on this affects whether he is going to be out in two years versus thirty years, then I think I should really have the right to know that up front because I think that changes can occur and sometimes changes don't occur, and if they get back out again and they repeat the offense then I am really angry about that.

A veniremember was concerned that a "person is put in prison and he is released within just a few months for a crime that he should be in there for a number of years." Several other veniremembers expressed concerns about parole and early release. Other veniremembers asked when a person sentenced to life could be paroled, but the court declined to answer.

The voir dire in this case exemplifies the difficulties and misperceptions potential jurors have with parole, especially in the context of a life sentence for capital murder. Thirty-five years is not an insubstantial length of time. A jury reasonably may be-

---

11. I point out that there is indeed a statutory definition of what life means for "a prisoner serving a life sentence for a capital felony" per Art. 42.18, § 8(b)(2), V.A.C.C.P.—"life" means the prisoner is not eligible for release on parole until the actual calendar time the prisoner has served, without consideration of good conduct time, equals 35 calendar years. The trial court could have answered the veniremember's question about what life means by relating the statutory language; and could have excised the word "parole" in phrasing the answer, e.g., "Per our statutes, a life sentence for capital murder means that the defendant is not eligible for release until he has served 35 years of actual calendar time without consideration of good conduct time." There is absolutely nothing statutory or constitutional, state or federal, that requires such information to remain a "state secret" hidden from jurors—and as I discuss further, there are indeed constitutional considerations that in some situations require that jurors be informed of such.

lieve that a person convicted of capital murder could be released on parole long before he serves thirty-five years if he were not executed. *Cf. Simmons*, 512 U.S. at ——, 114 S.Ct. at 2193, 129 L.Ed.2d at 141. To the extent this misperception pervades the jury's deliberation, it would have the effect of creating a false choice between sentencing the defendant to death and sentencing him to a relatively short period of incarceration. *Cf. Simmons*, 512 U.S. at ——, 114 S.Ct. at 2193, 129 L.Ed.2d at 141. This misunderstanding would be heightened by the prosecutor's urging the jury that the defendant would be a danger to society on the streets if he were not executed. *Simmons*, 512 U.S. at ——, 114 S.Ct. at 2193, 129 L.Ed.2d at 141.

"[T]here may be no greater assurance of a defendant's future nondangerousness to the public than the fact that he never will be released on parole." *Simmons*, 512 U.S. at ——, 114 S.Ct. at 2194, 129 L.Ed.2d at 142. It stands to reason that the fact that a capital murder defendant in Texas would not be considered for release on parole for thirty-five years would provide greater assurance of the defendant's future nondangerousness to society outside of prison than any misunderstanding that he would be eligible for parole considerably earlier. When a defendant presents evidence that he could be rehabilitated in prison and that the risk of violence is substantially reduced when the defendant reaches an advanced age, and the prosecutor argues that the defendant would be a danger to society on the streets, the fact that the defendant could not be released from prison for thirty-five years will often be the only way that a violent criminal can successfully rebut the State's case. *Cf. Simmons*, 512 U.S. at ——, 114 S.Ct. at 2200, 129 L.Ed.2d at 150–51 (O'Connor, J., concurring).

Without being allowed to have the jury informed of the thirty-five year requirement for parole eligibility, a defendant may be prohibited from rebutting information that the jury considers in answering the special issue. *Cf. Simmons*, 512 U.S. at ——, 114 S.Ct. at 2194, 129 L.Ed.2d at 143. The risk that the jury may consider misinformation about parole eligibility is great, and the consequences are vital to the defendant. *Simmons*, 512 U.S. at ——, 114 S.Ct. at 2197, 129 L.Ed.2d at 146–47.

A jury's task at the punishment phase of a capital murder trial is to answer the special issues. *Stoker*, 788 S.W.2d at 16. Generally, parole is a matter within the exclusive jurisdiction of the Board of Pardons and Paroles and is not a matter of concern for the jury. *Felder*, 758 S.W.2d at 762. However, the relevance of parole information in a capital case is not so the jury can determine a number of years to assess as punishment to circumvent the Executive branch and ensure the defendant remains incarcerated for a period of time the jury deems proper. Information concerning the thirty-five year parole eligibility requirement is directly relevant to the special issue about whether the defendant would be a continuing threat to society, notwithstanding our statement to the contrary in *Jones*, 843 S.W.2d at 495.

### v. The Texas Constitutional Question

Returning to the matter of the Texas Constitution mentioned previously, *supra* p. 131, I again note that prior cases hold that the Texas Constitution prohibits a parole instruction in a capital murder trial. *Garcia*, 887 S.W.2d at 860; *Elliott*, 858 S.W.2d at 489 n. 7; but see discussion of the 1989 amendment to Tex. Const. Art. IV, § 11(a) and Art. 37.07. V.A.C.C.P., *supra* at p. 133 n. 4. However, it is a firmly entrenched pillar of federalism that when there is a constitutional conflict, a federal constitutional right prevails over a state constitutional restriction. Since I believe that in the instant cause the failure to inform the jury about the thirty-five year parole eligibility plateau violated appellant's federal constitutional right to due process, such federal right prevails.

### D. Application to Present Case

Previously I have set out illustrative portions of the jury voir dire wherein parole was discussed. Veniremembers were very interested in parole. In fact, several of the veniremembers who ultimately served as jurors in this case inquired about parole during voir dire. Specifically, I observe that during questioning Juror Flanakin said,

I just—there is so much about people that are turned loose after serving such a short period of time in a prison for minor crimes and then go out and commit murder, and it's just really scary to hear things like that, that they are put away for not so serious crime and then turn around and do much worse crimes after being just sentenced for such a short period, or not sentenced but allowed to serve such a short period of time, and if people like that can do—go to that point, people that have already committed horrendous crimes, it just seems a little scary that they might do the same thing again, or be a hazard to society.

Juror Garcia said that he watched the news every night and that "[e]arly parolees and everything, they get out of jail and they commit another crime the next day." He indicated that he guessed that he could follow the judge's instructions that the early parole thing should not be considered in reaching the sentence.

Juror Strohbeck stated that she had "a problem with so many people who have thirty-five years and spend a few years, and because of overcrowding, they are let out." Juror Mallard, expressing concern about parole, said he felt "like that it would serve the criminal and rehabilitation system better if generally fines were fixed or sentences were fixed within a very narrow range, . . .; but, . . . that should be up to the sentencing at the time of sentence, not necessarily probation later, or parole later." Jurors Mitchell, Wilkinson, Englund and Miller, when asked about having previously mentioned concerns about the revolving door and early parole and about how long somebody would be locked away, indicated that they could follow the judge's instructions to not consider such. Thus *8 jurors*, i.e. *two-thirds of the jury* that would decide whether appellant lived or died, expressed a keen interest in the amount of time that this capital defendant would have to serve if he were sentenced to life rather than death.

In the punishment phase of the trial, the State presented evidence of prisoners' eligibility for release on furlough under a life sentence for capital murder.[12] Also at the punishment stage, appellant submitted evidence that he would not be a danger to prison society. Appellant was twenty-eight years old at the time of his trial. Appellant also presented expert testimony from a psychologist, who had been the chief mental health officer for the entire Texas Department of Corrections system, that indicated that when a person grows older his risk level for violence decreases and that the risk level of violence for a sixty-five-year-old inmate is significantly lower than that for a eighteen to twenty-five-year old. That psychologist specifically testified that he did not want to see appellant on the street, and that he did not think that it was in their or appellant's interest to be on the street, but that he did not believe that he would be a danger in prison society. The State in rebuttal presented testimony from an officer who investigated offenses within the prison system about how a capital murderer who received a life sentence would be classified upon entry into the system and would be reclassified, depending upon behavior, with such classifications depending "on the amount of time that they are pulling good time" and that it basically depended on disciplinary history while in the penitentiary that determined how one was assigned, "either to your trustee status or whether you remain line class and not pull any good time."

At punishment phase jury argument, the prosecutor encouraged the jury to consider appellant's risk to society on the streets. The prosecutor argued:

[Defense counsel] wants you—and I understand what he wants you—to focus only on prison society, and I am not suggesting that society does not include prison society. It includes all. He wants you to forget society on the street; and I'm saying, no, don't do that. This question doesn't say, "if he gets a life sentence." That's getting the cart before the horse.

12. Appellant raises a separate point of error contending that this furlough evidence should not have been admitted. The majority overrules that point by holding that appellant failed to correctly object to such evidence, thus waiving his right to complain of its admission. *Rhoades, supra,* 934 S.W.2d at 126–28.

You answer this question to determine what the sentence is going to be. You determine, whether it's today or tomorrow, next week, next year, inside prison, outside prison, wherever he may be, in whatever aspect of society he may find himself: Is there a probability that he's going to commit future acts of violence that would constitute a continuing threat?

The prosecutor also argued that appellant would be a danger to people in prison.

Another prosecutor argued, "Now we have to look at society's rights, and we look at how that defendant functions in society." The prosecutor traced appellant's history, pointing out the numerous crimes appellant had committed. The prosecutor argued, "Less than 24 hours after his release from prison he slaughters two men." This prosecutor also argued that appellant would be violent in prison.

"In assessing future dangerousness, the actual duration of the defendant's prison sentence is indisputably relevant." *Simmons*, 512 U.S. at ——, 114 S.Ct. at 2194, 129 L.Ed.2d at 142. The jury reasonably may have believed appellant would be released on parole well before serving thirty-five years if he were not executed. *Cf. Simmons*, 512 U.S. at ——, 114 S.Ct. at 2193, 129 L.Ed.2d at 141. The trial court did not allow appellant an opportunity to deny or explain whatever misinformation the jury had about the operation of the parole laws. *Cf. Simmons*, 512 U.S. at ——– ——, 114 S.Ct. at 2192–94, 129 L.Ed.2d at 140–44. The State argued that appellant would be a danger to prison society. *Cf. Simmons*, 512 U.S. at ——– —— n. 5, 114 S.Ct. at 2194–95 n. 5, 129 L.Ed.2d at 143–44 n. 5. However, the State also argued that appellant would be a threat to society outside of prison. The State urged the jury to answer the special issue "whether it's today or tomorrow, next week, next year, inside prison, outside prison, wherever he may be, in whatever aspect of society he may find himself." The State reminded the jury that appellant "slaughter[ed] two men" less than twenty-four hours after he was released from prison. Appellant was not allowed to rebut the State's argument that he would commit criminal acts of violence that would constitute a continuing threat to society outside of prison with information that the earliest he could even be considered for release into society outside of prison was in thirty-five years when he would be in his sixties.

Appellant's efforts to convince the jury that he would not be a danger to society beyond the prison walls were thwarted, as he was prevented from allowing the jury to know that under Texas law he could not be released on parole until he was at an age when, according to defense evidence, he would not endanger that society. *Cf. Simmons*, 512 U.S. at ——, 114 S.Ct. at 2194, 129 L.Ed.2d at 142–43. This effectively limited appellant's attempts to focus the jury's attention on whether he would be a future danger in prison. *Cf. Simmons*, 512 U.S. at ——, 114 S.Ct. at 2195, 129 L.Ed.2d at 144. The jury was left to speculate about the date of appellant's parole eligibility when evaluating the special issue. *Cf. Simmons*, 512 U.S. at ——, 114 S.Ct. at 2195, 129 L.Ed.2d at 144.

In the punishment charge the trial court instructed the jury:

During your deliberations, you are not to consider or discuss any possible action of the Board of Pardons and Paroles Division of the Texas Department of Criminal Justice or of the Governor, or how long the Defendant would be required to serve to satisfy a sentence of life imprisonment.

This instruction suggested to the jury that parole was available, but that the jury should be blind to when appellant could be released. *Cf. Simmons*, 512 U.S. at ——, 114 S.Ct. at 2197, 129 L.Ed.2d at 147. At the same time, the jury was required to answer the pertinent special issue with the State urging the jury to find that appellant would be a threat in and out of prison and appellant contending that, although he would be a threat out of prison anytime soon, he would pose no danger in prison and he would not be a threat in his sixties.

In this context, appellant's parole eligibility was obviously relevant to the jury's sentencing task in answering the future dangerousness special issue. "[I]n some circumstances, 'the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so

vital to the defendant, that the practical and human limitations of the jury system cannot be ignored.'" *Simmons*, 512 U.S. at —, 114 S.Ct. at 2197, 129 L.Ed.2d at 147 (citations omitted). As this Court has observed, experience demonstrates the best likelihood is that a jury will consider the existence of parole. *Arnold*, 786 S.W.2d at 300. Moreover, even if the instruction kept the jury from considering parole, it would not have satisfied due process as appellant was entitled to have the jury consider all relevant information in answering the special issue. *Cf. Simmons*, 512 U.S. at —, 114 S.Ct. at 2198, 129 L.Ed.2d at 147. While being incarcerated until reaching over sixty years of age certainly does not preclude a finding of future dangerousness, the fact of such a lengthy incarceration is evidence which, in the instant case, would be very relevant to the jury's answering of the future dangerousness special issue.

### E.  Conclusion

Under the record in this case, and in light of *Simmons*, I believe that the trial court's failure to allow appellant to have the jury informed at some point that a person sentenced to life for capital murder would not be eligible for parole until he serves thirty-five years violated appellant's right to due process. I do *not* believe that a capital murder defendant is *always* entitled to have the jury so informed; this issue is case specific to the facts of each particular case. But based upon the evidence presented in this particular case, I believe that appellant has shown a due process violation.[13] Accordingly, I respectfully dissent to the majority holding of no error in refusing to give a parole instruction as was requested by appellant. Such a holding is particularly ironic in these days of clamor for "truth-in-sentencing"—it would seem that the majority, in violation of constitutional due process, is approving and encouraging "untruth" or "ignorance" in sentencing in situations involving the ultimate

punishment, death. I respectfully refuse to go along with such ignorance.

---

**13.** Even such a constitutional error is subject to a harmless error analysis per Tex.R.App.Pro. 81(b)(2). Of course all of the evidence, including appellant's prior criminal record and offenses and the facts of the instant offense, would be considered in making such a determination.