Affirmed and Memorandum Opinion filed May 31, 2007








Affirmed and Memorandum Opinion filed May 31, 2007.

 

 

In The

 

Fourteenth Court of
Appeals

____________

 

 

NO. 14-06-00155-CR

____________

 

JERMARXIAN DEANDRE GREEN, Appellant

 

V.

 

THE STATE OF TEXAS, Appellee

 



 

On Appeal from the 185th
District Court

Harris County, Texas

Trial Court Cause No. 1033352

 



 

M E M O R A N D U M   O P I N I O N








A jury found appellant Jermarxian Deandre Green guilty of
manslaughter and assessed punishment at eighteen years= confinement in
the Institutional Division of the Texas Department of Criminal Justice.  On
appeal, appellant contends the trial court erred or abused its discretion by
(1) prohibiting cross-examination of a state=s witness in
violation of his right to confrontation and cross-examination, (2) denying
appellant=s motion for instructed verdict on the murder charge,
(3) denying appellant=s requests for jury charges on
lesser-included offenses of aggravated assault and deadly conduct, and (4)
denying appellant=s motion to dismiss or disqualify a juror
whose father had died during trial.  We affirm.

I.        Factual
and Procedural Background

Appellant and his older brother, Adrian Dewayne Green, were
each charged by indictment with the murder of Quinton Kelegon, the
complainant.  The two were tried together as co-defendants before the same
jury.  The jury found appellant guilty of manslaughter and found Adrian guilty
of murder.[1] 


The evidence presented at trial showed that, some time
before 2:00 a.m. on March 13, 2005, Kelegon and three friends, Desonyeigh
Dwayne Hooper, Lebroderick Williams, and Christopher Pope, decided to go to
Carrington=s, a night club located in a strip mall on South Main
inside Loop 610.  They arrived near closing time in Hooper=s vehicle, a 1990
Chevrolet Caprice Classic, and parked in the parking lot Carrington=s shared with
other businesses.  The group did not go inside Carrington=s, but instead
walked around the parking lot socializing and looking at girls. 

Also parked in the same parking lot was an orange or
tangerine colored, customized Ford Expedition owned by Adrian Green, appellant=s older brother.[2] 
Adrian was a local rapper, and he and appellant were promoting Adrian=s music CDs from
the Expedition.  

Eventually, as people began leaving the club, Kelegon and
his friends decided to leave the parking lot.  Hooper was driving the Caprice
and Kelegon sat in the front passenger seat.  Williams and Pope were seated in
the back, with Pope behind Hooper and Williams behind Kelegon.  








At this point, the facts developed at trial by the State=s witnesses
Hooper, Williams, and Pope differ in various details and diverge significantly
from those of the defense.  The State=s witnesses
testified generally that after they left the club=s parking lot they
stopped at a red light at South Main and Westridge.  At that time, they were
playing music in the Caprice from a CD entitled ATha Boss,@ by rapper Slim
Thug.  Thug=s music talked Aabout rappers@ and some of it
included Avery unflattering,@ Anegative@ references to
Adrian=s rap music.  

Adrian, driving the Expedition, with appellant as
passenger, pulled up on the passenger side of the Caprice.  According to the
State=s witnesses,
Adrian could hear the music and became angry, and he and Kelegon, in the front
passenger seat of the Caprice, exchanged words.  Adrian had an Aangry@ expression on his
face and appeared Ariled up, very angry@ toward Kelegon
and Hooper, the driver.  Pope testified that appellant said to Kelegon, ADo you know me?= and Kelegon
responded with ANo, I don=t know you.  Do
you know me?,@ which they repeated back and forth several times.[3] 
When Kelegon saw Adrian displaying an unloaded semiautomatic pistol, he told
Hooper that Adrian had a gun and said, A[L]et=s go.  Dude got a
pistol, he show it on the steering wheel, let=s go.@  At the next red
light, the Expedition pulled up next to the group on the driver=s side of the
Caprice, and Hooper saw appellant in the passenger seat Abent down low@ and Alooking like he
was loading a pistol.@  Hooper ran the red light, and he heard a
shot fired.  Hooper, Williams, and Pope all testified that no firearms were in
or fired from the Caprice.[4]








Hooper drove onto the 610 freeway heading north.  The Expedition
followed, pulled up alongside the passenger side of the Caprice, and several
shots were fired at the Caprice.  A bullet grazed Kelegon=s leg, and he
exclaimed, AMy leg is burning; it=s shot.  This dude
shot me.@  Then, as the two
cars sped along the freeway, the Expedition pulled up toward the driver=s side of the
Caprice, and more shots were fired.  One of the bullets shattered the driver=s side rear door
window of the Caprice and hit Kelegon in the side of the head.  Hooper exited
the 610 Loop at Evergreen, and drove Kelegon to a hospital, where he later
died. 

The hospital contacted the Houston Police Department, and
the incident was investigated by Officer A.G. Riddle of the Homicide Division
and several others.  Riddle examined the Caprice and determined that there were
seven fresh gunshot strikes in the vehicle, including four to the passenger
side and three to the driver=s side of the vehicle.  He also determined
that all of the shots were fired at angles from the rear of the vehicle toward
the front.  Riddle found no evidence indicating a firearm had been fired from
inside the Caprice.  The police attempted to locate, but never found, the
Expedition.

An autopsy was performed on Kelegon=s body by Dr.
Morna Gonsoulin, an assistant medical examiner with the Harris County Medical
Examiner=s Office. 
Gonsoulin determined that the cause of Kelegon=s death was a
gunshot wound to the head.  The bullet entered behind and slightly above the
left ear, and exited on the right side of the temple.  The bullet traveled from
left to right, slightly back to front, and slightly downward.[5] 
She also found a superficial abrasion on Kelegon=s right leg. 
Gonsoulin testified that Kelegon was pronounced dead at 1:30 p.m. on March 13,
2005.








Herbert Thompson, Jr., a friend of appellant who was called
by the State, testified that he saw appellant some time after the incident and
spoke to him about it.  Thompson testified that appellant told him that he and
Adrian had been to Carrington=s that night and that they were in the
Expedition when the shooting occurred.  Thompson could not remember whether the
reason appellant gave for the incident was that he and his brother were being
robbed or whether it was that they were being carjacked.  Thompson testified
that appellant believed he had fired the fatal shot, and appeared remorseful.

At trial, appellant testified in his defense, but his
brother, Adrian, did not.  Appellant=s version of
events differed significantly from those of the other witnesses to the incident,
particularly concerning who were the aggressors.  Appellant testified that he
was with Adrian on March 13, 2005, to help Adrian promote his CD.  Adrian was a
local celebrity and owned the Expedition.  Adrian drove the Expedition that
night.

When appellant and Adrian got to the traffic light at South
Main and Westridge, the Caprice pulled up to the driver=s side of the
Expedition and Kelegon twice said to Adrian, ADo you know me?,@ and Adrian
responded, AI don=t know you.@ Kelegon then
said, AWell, you know
what time it is,@ but Adrian did not say anything in
response.  As they were still waiting at the light, Kelegon then got out of the
Caprice, and appellant saw that Kelegon had a gun.  Appellant interpreted
Kelegon=s statements and
actions to mean that the occupants of the Caprice were attempting to carjack
them.  Adrian then sped towards the 610 Freeway, but the Caprice caught up to
the Expedition.  Adrian told appellant to hand him his gun, which Adrian said
was in the console of the Expedition.  Appellant handed the gun to Adrian, who
told appellant to get down. 

As the Caprice pulled up to the Expedition, Adrian began
shooting.  Then, as the Caprice came around to the passenger side of the
Expedition, appellant told Adrian to give him the gun.  Appellant shot twice at
the Caprice, not aiming at anyone or intending to kill anyone, but just Ato get those guys
off of us.@  He saw one of the bullets shatter the back driver=s side window.  He
believed that this shot killed Kelegon. 








Appellant admitted that he knew that four people rode in
the Caprice because he could see them.  He acknowledged that firing a loaded
weapon at a car full of people was an act clearly dangerous to human life. 
Although he acknowledged that seven bullet holes were found in the Caprice, he
claimed he had done nothing wrong because Kelegon and the others were trying to
rob him and he was trying to protect himself.  He agreed that the forensic
testimony showed the bullets traveled from the rear of the Caprice toward the
front, but he would not agree that he and appellant were behind the Caprice
when the shots were fired into it.  Instead, he claimed he shot twice when the
Caprice pulled alongside the Expedition and was even with it.  After the
incident, he inspected the Expedition found no bullet holes.

The jury found appellant guilty of the lesser included
offense of manslaughter and affirmatively answered a special issue concerning
the use of a deadly weapon during the commission of the offense.  Following the
punishment phase, the jury assessed appellant=s punishment at
eighteen years= confinement in the Institutional Division of the
Texas Department of Criminal Justice.  The jury also found Adrian guilty of
murder and assessed his punishment at fifty years in the Institutional Division
of the Texas Department of Criminal Justice and a $10,000 fine.  On February
15, 2006, the trial court sentenced appellant and entered judgment in accordance
with the jury=s verdicts.    II.        Analysis of Appellant=s Issues

A.      Issue 1: 
Cross-Examination of the State=s Witness

In his first issue, appellant contends the trial court
reversibly erred by prohibiting appellant from cross-examining a State=s witness
concerning issues raised in direct examination as to appellant=s demeanor and
character.  He claims the court=s refusal to allow him to cross-examine
violated his constitutional right to confrontation and cross-examination. 
Specifically, when the State was examining Herbert Thompson, Jr. about his
encounter with appellant after Kelegon was killed, appellant points to the
following direct examination by the prosecutor, Mr. Cotlar:

Q.      [State] Okay.  And tell the jury the mood he
was in when you first started talking to him.








A.      [Thompson] Well, when I first started
talking to him, you know, it was like, just a regular, you know, when you meet
someone.  But then when I asked him about that, I could just see his whole mood
just completely changed, you know, like he was very remorseful for whatever the
situation that went down, what happened.  And, you know, I really felt bad for
him because I know how B B I know how he was as a kid and I know, you know,
for some reason, you know, it=s just not him, you know, even B B he just felt B B 

Q.      [State] Did he look hurt to you?

A.      [Thompson] Yes, sir.

* * *

Q.      [State] What, if any, assistance did you
offer Jermarxian that day that y=all had that conversation?

A.      [Thompson] I was going to pray for him.

Q.      [State] Anything else?

A.      [Thompson]
And that I would be a character witness if he needed one.

Appellant=s complaint on appeal concerns the
following cross-examination by defense counsel, Mr. Leitner:

Q.      [Leitner] The last thing you said was B B is you told him you would be a character witness
for him.

A.      [Thompson] Yes sir.

Q.      [Leitner] What did you mean by that?

A.      [Thompson] To B B you know, because I know he was in some type of trouble.  It was
there.  But to let people know that he was, you know, he=s a good kid, from what I know.

[State] Mr. Cotlar: 
Judge, I object to this testimony, regrettably.

The Court:    Sustained.

Q.      [Leitner] Okay.  You also made the comment,
when you were testifying to questions asked by the prosecutor, you said, AI know that ain=t him.@  What does that mean?

A.      [Thompson] Because B B 

Mr. Cotlar:    Judge, I=m going to lodge my same objection.

Mr. Leitner:  If I could respond,
Judge.  They put that in.  I have a right to have him explain what he meant by
that.

The Court:    I=m going to sustain
the State=s objection.








Later, appellant=s trial counsel
made the following bill of exception:

When it comes to Mr. Thompson, Herbert Thomson, Jr.,
who testified, had I been able to ask him these questions, I would ask him that
when he was questioned on direct examination, he made the statement that,
referring to what he heard and Jermarxian Green, AI know that that ain=t him,@ and I wanted him to explain what he meant by, AI know that that ain=t him.@  And I believe that he would have
testified that he=s not the kind of person that would
do that, that from what I know about him, that that was totally out of his
character and that I B B that=s why I could not believe, because that=s just not him.  

Likewise, he
stated that Jermarxian Green was remorseful and he acted like he didn=t want to be
involved in this.  He acted like he was hurt, like he had lost his best
friend.  I would ask him to explain what he meant by those statements, and I
believe that he would have explained more on the issue of what remorseful meant
about how Jermarxian Green seemed like he was truly sorry that this happened,
that he had never wanted to be involved in this in the first place, is what he
got from him when he said that.  And that his remorse and his hurt was similar
to what it would be like, he would expect, if the person had lost his best
friend.  And all of those things are things that B B the statements
themselves were brought out on direct examination, and I would have just asked
to clarify what he meant by those statements on cross-examination.  That would
be the total bill on Mr. Thompson, and I would object that not being able to
ask him those questions denied my right of confrontation.

On appeal, appellant contends the trial court=s rulings
sustaining the State=s objections were erroneous because the
line of questioning he sought to develop was relevant to his Astate of mind
concerning his conduct on March 13, 2005.@[6]  Appellant claims
he would have established that he Aat wors[t], acted
recklessly with regard to his behavior the night of the incident@ and would have
shown Athat it would have
been out of character for [him] to have acted out of aggression or with intent
to commit the murder of the Complainant and that he would have acted with a
mental state demonstrating self-defense.@[7]








However, appellant cites no specific case for these
propositions and provides no explanatory argument.  He merely states in a
conclusory fashion that the trial court=s limitation on
his cross-examination denied him his right to confrontation and
cross-examination and cites generally to the Sixth and Fourteenth Amendments to
the United States Constitution and to Article I, section 10 of the Texas
Constitution.  This briefing is inadequate; it provides no legal support whatsoever
for his claim that the testimony was admissible for the reasons he advanced. 
As a result, it leaves us nothing to review.  See Tex. R. App. P. 38.1(h) (requiring an
appellant=s brief to contain a clear and concise argument for
the contentions made, with appropriate citations to authorities and to the
record); Rhoades v. State, 934 S.W.2d 113, 119 (Tex. Crim. App. 1996) (AIt is incumbent
upon counsel to cite specific legal authority and to provide legal argument
based upon that authority.@). 








Moreover, we disagree with appellant=s characterization
of the testimony that would have been elicited as demonstrating appellant=s Astate of mind@ at the time of
the offense.  Thompson was not present at the time of the offense and so had no
personal knowledge of it.  Thompson=s answers to the
State=s questions and
defense counsel=s bill of exception do not in any way
suggest that Thompson could have provided any relevant testimony concerning
appellant=s state of mind at the time of the offense. 
Apparently recognizing the disconnect between his argument and the record, appellant
urges that A[o]nly some of the relevant evidence that would have
been obtained@ is reflected in the bill of exception.  However, an
appellate court must review the ruling admitting or excluding evidence in light
of what was before the trial court at the time the ruling was made.  Willover
v. State, 70 S.W.3d 841, 845 (Tex. Crim. App. 2002); Weatherred v. State,
15 S.W.3d 540, 542 (Tex. Crim. App. 2000).  Thus, even if appellant had not
failed to adequately brief the issue, [his argument would fail.

We therefore overrule appellant=s first issue.

B.      Issue 2: 
Denial of Appellant=s Motion for
Instructed Verdict

In his second issue, appellant contends the trial court
committed reversible error when it denied his motion for instructed verdict on
the charge of murder.  He claims that the State failed to prove that he had the
Arequisite culpable
mental state (as well as other elements)@ to commit murder,
and asserts that the jury=s verdict of manslaughter supports this
argument. 

A challenge of the trial court=s denial of a
motion for instructed verdict is, in effect, a challenge to the legal
sufficiency of the evidence to support the conviction.  See Williams v.
State, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996).  The relevant question
under this standard is whether, after viewing the evidence, both State and
defense, in the light most favorable to the verdict, any rational trier of fact
could have found the essential elements of the offense beyond a reasonable
doubt.  Id.; Madden v. State, 799 S.W.2d 683, 686 (Tex. Crim.
App. 1990). 








Here, the evidence showed that Kelegon was hit with a
bullet fired from the passenger side of the Expedition and that appellant was
the front-seat passenger in the Expedition.  Appellant admitted he
intentionally fired two shots into a vehicle he knew was occupied by four
people.  Based on this evidence, a rational jury could have found that
appellant intentionally or knowingly caused Kelegon=s death or that
appellant intended to cause serious bodily injury and committed an act clearly
dangerous to human life that caused Kelegon=s death.  See
Adanandus v. State, 866 S.W.2d 210, 215 (Tex. Crim. App. 1993) (AIntent to kill may
be inferred from the use of a deadly weapon in a deadly manner); Sutton v.
State, 35 S.W.3d 738, 739 (Tex. App.CHouston [1st
Dist.] 2000, pet. dism=d as untimely filed) (holding trial court
did not err in denying instructed verdict based on lack of intent to kill or
cause serious bodily injury when jurors could have found intentional conduct
and even though appellant was convicted of manslaughter).  Therefore, the trial
judge did not err when it denied appellant=s motion for
instructed verdict.[8]


We overrule appellant=s second issue.

C.      Issue 3: 
Denial of Jury Charges on Lesser-Included Offenses

In his third issue, appellant contends the trial court
abused its discretion and committed reversible error in denying his requests
for jury charges on the lesser-included offenses of aggravated assault and
deadly conduct.  Appellant=s trial counsel requested charges on the
lesser-included offenses of manslaughter, aggravated assault, and deadly
conduct.  The trial court granted the request for submission of the
lesser-included offense of manslaughter to the jury, but denied appellant=s request for
instructions on aggravated assault and deadly conduct.

1.       Applicable
Law and Standard of Review








A defendant is entitled to a lesser included offense
instruction if (1) the lesser-included offense must be included within the
proof necessary to establish the offense charged, and (2) some evidence must
exist in the record that if the defendant is guilty, he is guilty only of the
lesser offense.  Pickens v. State, 165 S.W.3d 675, 679 (Tex. Crim. App.
2005).  The evidence must establish the lesser‑included offense as a
valid rational alternative to the charged offense.  Arevalo v. State,
943 S.W.2d 887, 889 (Tex. Crim. App. 1997).  In determining whether the trial
court erred in failing to give a charge on the lesser included offense, we
review all of the evidence presented at trial.  Rousseau v. State, 855
S.W.2d 666, 673 (Tex. Crim. App. 1993).  If the evidence raises the issue of a
lesser included offense, a jury charge must be given based on that evidence, A>whether produced
by the State or the defendant and whether it be strong, weak, unimpeached, or
contradicted.=@  Id. at 672 (quoting Bell v.
State, 693 S.W.2d 434, 442 (Tex. Crim. App. 1985)).  When we review a trial
court=s decision to deny
the request, we consider the charged offense, the statutory elements of the
lesser offense, and the evidence actually presented at trial.  Hayward v.
State, 158 S.W.3d 476, 478 (Tex. Crim. App. 2005). 

2.       Aggravated
Assault

The first prong of the test requires us to determine
whether the offense for which the lesser-included offense instruction is sought
is actually a lesser-included offense of the charged offense.  Threadgill v.
State, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004).  Under Code of Criminal
Procedure article 37.09, an offense is a lesser included offense if

(1) it is established by proof of the same or less than all the facts
required to establish the commission of the offense charged;

(2) it differs from the offense charged only in the respect that a less
serious injury or risk of injury to the same person, property, or public
interest suffices to establish its commission;

(3) it differs from the offense charged only in the respect that a less
culpable mental state suffices to establish its commission;  or

(4) it consists of an attempt to
commit the offense charged or an otherwise included offense. 

Tex. Code Crim. Proc. art. 37.09. 

Here, the indictment against appellant charged that he Aunlawfully,
intentionally and knowingly cause[d] the death of [the complainant] . . . by
SHOOTING THE COMPLAINANT WITH A DEADLY WEAPON, NAMELY A FIREARM@ and Aunlawfully
intend[ed] to cause serious bodily injury to [the complainant] . . . and did
cause the death of [the complainant] by intentionally and knowingly committing
an act clearly dangerous to human life, namely BY SHOOTING THE COMPLAINANT WITH
A DEADLY WEAPON, NAMELY A FIREARM.@








Aggravated assault may be a lesser included offense of
murder.  See Dowden v. State, 758 S.W.2d 264, 269 (Tex. Crim. App.
1988).  The relevant statute provides, in pertinent part, that a person commits
aggravated assault if he commits assault as defined in section 22.01 of the
Penal Code and he uses or exhibits a deadly weapon during the commission of the
assault.  See Tex. Pen. Code
' 22.02(a)(2).  A
person commits the offense of assault if the person: (1) intentionally,
knowingly, or recklessly causes bodily injury to another, including the person=s spouse; (2)
intentionally or knowingly threatens another with imminent bodily injury,
including the person=s spouse; or (3) intentionally or
knowingly causes physical contact with another when the person knows or should
reasonably believe that the other will regard the contact as offensive or
provocative.  Id. ' 22.01(a).  Appellant does not specify
which type of assaultive conduct he contends applies; we will presume the
relevant provision is an assault by intentionally, knowingly, or recklessly
causing bodily injury.  See id. ' 22.01(a)(1).  

Appellant contends the evidence supported a charge on
aggravated assault as a party to the conduct of his brother and codefendant,
Adrian.  Specifically, appellant argued at trial that the jury could have
concluded that if he was guilty, he was guilty only as a party to his brother=s apparent act of
shooting Kelegon in the leg.  

However, although the jury could have rationally inferred
from the evidence that appellant=s brother fired
the bullet that hit Kelegon in the leg and was therefore guilty of an
aggravated assault, that aggravated assault was a separate assault upon Kelegon
that was not within the conduct charged in the indictment.  Only the bullet
wound to Kelegon=s head caused his death and it was the
conduct that resulted in his death that was the subject of the indictment. 
Therefore, appellant was not entitled to an instruction on the lesser offense
of aggravated assault based on the injury to Kelegon=s leg.  Cf.
Hayward, 158 S.W.3d at 480 (holding trial court correctly refused requested
instruction for simple assault as lesser-included offense of murder when the
simple assault shown by the evidence was separate from and not included with
the conduct charged in the indictment).  

 








3.       Deadly
Conduct

Appellant also contends the trial court erroneously denied
his request for an instruction on deadly conduct.  Appellant points to his own
testimony that he saw Kelegon with a gun and believed that Kelegon and Hooper
were attempting to carjack the Expedition, and as the Caprice containing
Kelegon, Hooper, and the two others approached the passenger side of the
Expedition, he Ajust shot twice@ merely to Aget those guys off
of us.@  Appellant also
admitted that pointing and firing the gun at a car full of people was clearly
dangerous to human life.  Appellant contends this testimony establishes the
elements of the offense of deadly conduct, because a rational jury could have
concluded that appellant did not intend to commit serious bodily injury.

A person commits the offense of deadly conduct if he Arecklessly engages
in conduct that places another in imminent danger of serious bodily injury,@ or if he Aknowingly
discharges a firearm at or in the direction of: (1) one or more individuals; or
(2) a habitation, building, or vehicle and is reckless as to whether the
habitation, building, or vehicle is occupied.@  Tex. Penal Code ' 22.05(a), ' 22.05(b)(1)B(2).  An offense
under subsection (a) is a Class A misdemeanor, and an offense under subsection
(b) is a third-degree felony.  Id. ' 22.05(e). 

For purposes of this issue, we will assume without deciding
that deadly conduct is a lesser included offense of murder as charged in the
indictment.  See Ortiz v. State,
144 S.W.3d 225, 233B34 (Tex. App.CHouston [14th Dist.] 2004, pet. ref=d) (en banc) (holding that deadly conduct was a
lesser-included offense of murder under the facts of that case).  However, even
with this assumption, appellant cannot prevail because he cannot satisfy the
second prong of the test.  Specifically, the evidence does not support a
rational finding that if appellant is guilty, his is only guilty of the lesser
included offense of deadly conduct.  See
Guzman v. State, 188 S.W.3d 185, 188B89 (Tex. Crim. App. 2006) 








Here,
appellant urges us to consider his testimony that he did not aim at anyone in
particular, but merely Ashot twice@ to Ato get those guys off of us@ because he thought they were being
carjacked.  Thus, appellant argues, the elements of deadly conduct are
satisfied because a rational jury could have concluded that he did not intend
to commit serious bodily injury.[9]  However,
appellant also testified elsewhere in the record that he was not trying to
shoot in the air, he was aiming at the car, he knew there were four people in
the car, and he knew that firing a loaded weapon at a car full of people was
clearly dangerous to human life.[10]  Given these
facts, the jury could not rationally convict appellant only of deadly
conduct, because, if believed, appellant=s own testimony demonstrates that he
intentionally or recklessly caused the complainant=s death.  See id. at
194 (holding appellant convicted of attempted murder not entitled to
instruction on deadly conduct when he admitted he had a reckless state of mind
and his conduct resulted in serious bodily injury; his testimony established
the offense of aggravated assault and thus a jury could not rationally find him
guilty only of deadly conduct); see also Forest v. State, 989 S.W.2d
365, 368 (Tex. Crim. App. 1999) (appellant, who testified he meant to shoot
victim Ain the butt@ and did not intend to kill him, was
not entitled to aggravated assault instruction when his own testimony showed he
intended to cause serious bodily injury to victim and his act caused victim=s death and thus he was guilty at
least of murder); Jackson v. State, 992 S.W.2d 469, 475 (Tex. Crim. App.
1999) (per curiam) (AA murder defendant is not entitled to an instruction on the
lesser included offense of aggravated assault when the evidence showed him, at
the least, to be guilty of a homicide.@). 








We overrule appellant=s fourth issue.

D.      Issue 4: 
Denial of Appellant=s Motion to Dismiss
or Disqualify a Juror

In his fourth and final issue, appellant contends the trial
court abused its discretion in denying his motion to dismiss or disqualify a
juror whose father died during the trial.  During the guilt-innocence stage,
the trial court learned that the father of a juror, Ms. Schwarz, had died.  The
trial judge expressed his condolences, and, with the parties= agreement,
inquired into whether the juror could continue serving on the jury:

The Court:    We all wanted to make
sure you were okay to serve.

A Juror:       I=m good.

The Court:    Not any problem?

A Juror:       No.  There=s no memorial service here.  It=s all B B we=re taking ashes in two weeks up to Canada.  There=s a memorial service that has to be
fixed here.  Nothing that has to be done.

The Court:    We weren=t as worried about that as you
being B B mentally being okay.

A Juror:       He was ill and it
was just an accident.  To a certain extent we were prepared for this.  We
needed to handle stuff over Friday.

The Court:    We just wanted to
make sure you were in an okay place to continue doing this.

A Juror:       Yes, I am.

The Court:    Okay.  Thanks.

A Juror:       You=re welcome.

Appellant=s counsel objected
to the juror=s continued service on the grounds that she might be
more susceptible to victim impact testimony at the punishment stage than other
jurors.  The trial court, construing this objection as a motion to disqualify
the juror, denied the motion, noting that the juror was not crying and did not
appear to be upset.








1.       Applicable
Law and Standard of Review

A trial court may excuse a juror from further service if
the juror becomes disabled during trial.  See Tex. Code Crim. Proc. art. 36.29.  A juror is disabled within
the meaning of the statute if the juror is physically or mentally impaired in
some way which hinders his or her ability to perform the duty of a juror.  See
Brooks v. State, 990 S.W.2d 278, 286 (Tex.  Crim. App. 1999).  We review the
trial court=s determination as to whether a juror is disabled for
abuse of discretion.  See id.

2.       Analysis
of Appellant=s Issue

Appellant contends that the trial court=s inquiry, Aalthough
well-meaning,@ was improper and insufficient to establish whether
the juror could fully and fairly perform her functions as a juror.  See
Reyes v. State, 30 S.W.3d 409, 411 (Tex. Crim. App. 2000) (recognizing that
a disability is not limited to physical disease, but also includes any
condition that inhibits a juror from fully and fairly performing the functions
of a juror).  According to appellant, the trial court=s inquiry
minimized the juror=s ability Ato expound on how
and to what extent the death of her father would affect her ability to perform
her duties as a juror,@ and did not take into account the impact
the death of a parent could have on a juror, particularly in a murder trial in
which the defendant is accused of taking another person=s life.  As
additional support for his argument, appellant further contends that the trial
court should have dismissed the complained-of juror because the trial could
have continued with eleven jurors, with or without the parties= consent.  See
Hill v. State, 90 S.W.3d 308, 315 (Tex. Crim. App. 2002) (noting that
Article 36.29 permits a trial to proceed with eleven jurors without the consent
of the parties when one juror becomes disabled).








We disagree with appellant that the trial court=s inquiry into the
juror=s ability to
continue to sit as a juror was insufficient.  Moreover, the juror=s responses to the
trial court=s questions indicated that she was not mentally
impaired by the death of her father in a way that would hinder her ability to
perform her duties as a juror.  The trial court=s inquiry elicited
the juror=s explanation of the details surrounding her father=s death, and the
juror expressly affirmed that she was able to continue sitting as a juror.  We
also think it significant to our resolution of this issue that the court was
able to watch the juror closely as it questioned the juror regarding her father=s death and the
family=s plans to
commemorate his death.  Under these circumstances, we hold the trial court did
not abuse its discretion in denying appellant=s motion to
disqualify the juror.

We overrule appellant=s fourth issue.

Conclusion

We overrule appellant=s issues and
affirm the trial court=s judgment.

 

 

 

/s/      Wanda McKee Fowler

Justice

 

 

 

 

Judgment rendered and Memorandum
Opinion filed May 31, 2007.

Panel consists of Chief Justice
Hedges and Justices Fowler and Edelman.

Do Not Publish C Tex.
R. App. P. 47.2(b).

 









[1]  Adrian Dewayne Green was indicted in Cause No.
1021417, in the 185th District Court of Harris County.  Upon finding Adrian
guilty of murder, the jury assessed his punishment at fifty years= confinement in the Texas Department of Criminal
Justice, Institutional Division and a $10,000 fine.  This Court considered his
appeal in Cause No. 14-06-00154-CR. 





[2]  The Expedition was described as having
Lamborghini-style doors that opened upward and spinning rims, among other things.





[3]  Hooper testified that appellant said to Kelegon, ADo y=all got a
problem with me?,@ to which Kelegon responded, AMan, I don=t
even know you@ and AWho are you?@





[4]  When the police examined the Caprice, they found a
box containing several .25 caliber bullets in the glove compartment.  Also
found was a gun case, and inside the case was a clip containing 9 millimeter
bullets, which Hooper testified was locked and in the trunk of his car along
with other possessions because he had recently moved.  In addition, the police
found a lock box containing a box of ammunition for a .22 caliber rifle.





[5]  Darrell Stein, a firearms examiner, compared the bullet obtained from
Kelegon=s head to the six bullet fragments
recovered from the Caprice by Officer Riddle.  Although he could not determine
with certainty that they were all fired from the same gun, all had sufficient
characteristics to enable him to testify that they could have been fired from
the same type of firearm, which would have included the 9 millimeter
semiautomatic pistol. 





[6]  Appellant contends this Astate of mind@ evidence was admissible under Texas Rule of Evidence
611(b) because Rule 611(b) allows cross-examination on Aany matter relevant to any issue in
the case, including credibility.@  See Tex. R.
Evid. 611(b). 





[7]  Initially, appellant also complains that the trial
court=s rulings were erroneous because the State, Amerely[] by stating >objection= gave nothing for the Trial Court to sustain.@  Appellant cites no authority for his proposition,
and we are unpersuaded.  A  trial court=s
ruling on the admissibility of evidence is reviewed for abuse of discretion and
will be upheld if it is reasonably supported by the record and correct under
any theory of law applicable to the case, based on what was before the trial
court at the time the ruling was made.  See Brito Carrasco v. State, 154
S.W.3d 127, 129 (Tex. Crim. App. 2005); see also Martinez v. State,
74 S.W.3d 19, 21 (Tex. Crim. App. 2002) (holding appellate court may properly
affirm denial of hearing on motion for new trial based on finding of
insufficient affidavit even though that specific claim was not raised by the
State). 





[8]  Appellant also asserts in his brief that, as a
result of the trial court=s denial of his motion, he was Aforced@ to put on
evidence of his innocence and so Afelt
compelled@ to testify on his own behalf.  Appellant also argues
the denial of his instructed verdict improperly shifted the burden of proof
from the State to appellant to prove his innocence.  However, appellant does
not direct us to, and we do not find, anything in the record to support his
assertions that he was forced or otherwise compelled to testify.  Nor does he
cite any authority to support his argument.  Therefore, the argument is
insufficiently briefed and presents nothing for review.  See Tex.
R. App. P. 38.1(h); Rhoades, 934 S.W.2d at 119. 





[9]  Appellant does not specify whether his conduct
satisfies Penal Code sections 22.05(a), 22.05(b)(1), or 22.05(b)(2).





[10]  Accordingly, the facts of this case distinguish it
from Ortiz.  Ortiz, the defendant, was one of two people in a car who
allegedly fired a gunshot that killed the complainant.  Ortiz was charged with
murder but was convicted on the lesser included offense of deadly conduct.  On
appeal, Ortiz argued that the trial court erred in submitting the deadly
conduct charge.  Ortiz, 144 S.W.3d at 229.  This Court held that
appellant failed to present a record reflecting which party requested the
instruction and thus the record did not affirmatively demonstrate error
requiring reversal, and, additionally, appellant failed to demonstrate the
existence of egregious harm.  Id. at 230.  In dicta, this Court noted
that even if it considered appellant=s
contention on the merits, it would fail because, in that case, deadly conduct
was a lesser included offense of murder and so satisfied the first prong of the
test.  Id. at 233B34.  This Court went on to state that the second prong
of the test was also satisfied because the evidence that appellant told the
police he fired his pistol Atwo times in
the air@ was some evidence that appellant was guilty only of
deadly conduct.  Id. at 234.  Here, in contrast, appellant affirmatively
denied shooting into the air, and admitted intentionally firing into a car
containing four people.