Opinion issued April 9, 2009 















In The

Court of Appeals

For The

First District of Texas






NO. 01-08-00841-CR

__________


CHRISTOPHER C. BRISKER, Appellant


V.


THE STATE OF TEXAS, Appellee






On Appeal from the 263rd District Court

Harris County, Texas

Trial Court Cause No. 1049108






MEMORANDUM OPINION

 Appellant, Christopher C. Brisker, with an agreed punishment recommendation
from the State, pleaded guilty to the offense of aggravated assault of a family
member. (1) The trial court deferred adjudication of appellant's guilt, placed him on
community supervision for seven years, and ordered him to pay restitution in the
amount of $3,500 and to perform 320 hours of community service.

 The State subsequently filed a motion to adjudicate appellant's guilt, alleging
that he violated the terms and conditions of community supervision by, among other
things, committing the offense of aggravated assault in violation of the laws of the
State of Texas. (2) Appellant pleaded not true to these allegations. After conducting a
hearing on the State's motion, the trial court found, by a preponderance of the
evidence, the State's allegations to be true, found appellant guilty, and assessed his
punishment at confinement for twenty years.

 In two points of error, appellant contends that the evidence is "legally and
factually insufficient" to support the trial court's adjudication of his guilt for
violations of the conditions of his deferred adjudication community supervision and
the trial court erred in assessing a sentence that is "excessive and disproportionate to
the crime committed."

 We affirm. Factual Background Adelina Rodriguez, a community supervision officer, testified that, as a
condition of appellant's community supervision, appellant could not commit an
offense against the laws of the State of Texas. (3)

 Canzata Drakes, appellant's friend, testified that in April 2008, she and her
husband, Michael Drakes, went to a company function with appellant. After the
function, the Drakes and appellant went to appellant's house to drop off the Drakes'
children and pick up appellant's girlfriend to visit a club. After staying at the club for
three hours, Canzata, the group's driver, told the group that it was time to leave, but
appellant, who had become intoxicated, did not want to leave. Appellant and Michael
argued over "petty stuff" on the drive to appellant's house, and, when the group
returned to appellant's house, appellant told Michael, "[Y]ou got to be glad that you
my cousin, you and your wife be dead right now." The Drakes were shocked and
scared and got out of their car to take their children from appellant's house. At some
point, appellant and Michael began arguing again and hitting each other. Canzata did
not see any weapons on her husband, and, when she then got out of the car, she saw
that her husband was "getting cut" by appellant, who was holding something small
in his hand and slashing it back and forth. Canzata realized that appellant had a knife
in his hands when she saw "so much blood" on her husband's torso and shoulders. 

 Michael told Canzata to get back in their car and take him to the hospital. The
Drakes then ordered their children, who had also exited the car during the fight, to get
back into the car. Canzata then drove her family away from appellant's house, but,
approximately five minutes later, appellant pulled up in a car next to the Drakes at a
stoplight. The Drakes tried to ask appellant why he was following them. Believing
that appellant had a gun, Michael exited the Drakes' car to block appellant from
hurting his family. Appellant, who was leaning out of the window of his car, reached
over and stabbed Michael again, this time in the face and hand. While appellant was
stabbing Michael, appellant kept saying, "he don't know me." Canzata saw her
husband grab something and then she heard a knife drop on the ground. Canzata
confirmed that her husband did not have any weapons on him. After Michael got
appellant's knife, appellant drove away, and Canzata called for emergency assistance. 
 

 To treat his injuries, Michael underwent surgery on his shoulder and in his lung
area. Canzata explained that her husband had also suffered internal bleeding, and the
doctors told her that appellant had missed stabbing her husband's lung by an inch. 
Michael also received staples in his chest area and stitches on his face.

 On cross-examination, Canzata agreed that as she and her husband left
appellant's house after picking up their daughters, her husband kicked a laundry
basket outside of appellant's house and that is when appellant and appellant's
girlfriend came out of their house. Canzata further testified that she saw a "little bit"
of the knife in appellant's hand at the stoplight and she could see appellant had
something in his hand. 

 Monesha Harris, the Drakes' daughter, testified that she saw her father and
appellant get into a fight outside of appellant's house, and she realized after her father
had started bleeding that he had been stabbed in his stomach. The Drakes all got into
their car, and the children began putting pressure on Michael's wounds to stop the
bleeding. Appellant then met up again with the Drakes at a stoplight, and he stabbed
Michael again in the face and hand. Harris saw a metallic blade in appellant's hand. 
The family continued to apply pressure to Michael's wounds "so he wouldn't die." 
 Lannette Webb, appellant's fiancé, testified that on the evening in question, the
Drakes and appellant, who had been at a company function together, came to the
house she shared with appellant. The Drakes and Webb left their children at the
house, and then the four adults left together to go to a sports bar, where both Michael
and appellant became intoxicated. Michael became upset in the bar, and Michael and
appellant began arguing in the car on the way home. At some point, Michael opened
the back door of the car to try to push appellant out of the car. When the group got
to the house, appellant went inside the house to get the children. When Webb
returned outside, she saw Michael in the garage "cussing" and throwing things. 
Webb and Canzata told Michael to leave, and he did. Then, appellant came out of the
house, Michael began "cussing" again, and appellant and Michael began fighting. 
Webb did not see any weapons on either man. After the fight ended, the Drakes left,
Webb began to clean up the mess, and then appellant left to go to the store. 
Appellant returned with a cigar, and Webb noticed a cut on appellant's hand. Webb
stated that there was blood in the driveway of her home, but she said it could have
been either Michael's or appellant's blood. 

 Appellant testified that he and the Drakes went to the company function, where
both he and Michael had "a couple" of drinks. The group then returned to appellant's
house and decided to go to a sports bar, along with appellant's fiancé. Michael
became intoxicated at the bar. Appellant stated that he did not get into any altercation
with Michael at the bar. However, on the way home, Michael tried to push him out
of the car, and appellant and Michael argued on the way home. When they got home,
appellant went inside the house, but, after receiving a phone call from a concerned
neighbor, he returned to the garage and saw that Michael had made a mess in the
garage and put holes in the sheet rock. Michael then began "cussing" at appellant
and ran up to appellant to fight him, but appellant fought off Michael. Appellant
denied having any weapon. As an explanation for Michael's injuries, appellant said
that, during the fight, he had lost his balance and had ended up on the ground. When
Michael placed his forearm on appellant to hold appellant down, appellant started
trying to fight Michael off. Appellant noticed something poking him while he was
on the ground, "like a little piece of metal or something," and he grabbed it and tried
to get Michael off of him. Appellant stated that he sustained a cut on his thumb in the
fight.

 After the Drakes left, appellant went to the store to get a cigar, but then saw the
Drakes again on the road at an intersection a few minutes later. Michael came toward
appellant's car and began swinging at appellant, and appellant tried to push him off. 
When the stoplight changed, appellant "peeled on off."

Standard of Review

 Appellate review of an order adjudicating guilt is limited to determining
whether the trial court abused its discretion. Tex. Code Crim. Proc. Ann. art. 42.12,
§ 5(b) (Vernon Supp. 2008) ("This determination [to adjudicate guilt] is reviewable
in the same manner as a revocation hearing conducted under Section 21 of this article
in a case in which an adjudication of guilt had not been deferred."); see Rickels v.
State, 202 S.W.3d 759, 763 (Tex. Crim. App. 2006) ("Appellate review of an order
revoking probation is limited to abuse of the trial court's discretion."). The trial
court's decision should be supported by a preponderance of the evidence. See id. 
The evidence meets this standard when the greater weight of the credible evidence
creates a reasonable belief that a defendant has violated a condition of his community
supervision. Id. at 764 (quoting Scamardo v. State, 517 S.W.2d 293, 298 (Tex. Crim.
App. 1974)).

 We must examine the evidence in the light most favorable to the trial court's
order. Garrett v. State, 619 S.W.2d 172, 174 (Tex. Crim. App. 1981). As the sole
trier of fact, a trial court determines the credibility of witnesses. See id.; Jones v.
State, 787 S.W.2d 96, 97 (Tex. App.--Houston [1st Dist.] 1990, pet. ref'd). To
support the trial court's order to adjudicate guilt, the State need only establish one
sufficient ground for revocation. See Moore v. State, 605 S.W.2d 924, 926 (Tex.
Crim. App. 1980) (stating that one sufficient ground for revocation is enough to
support trial court's decision); Joseph v. State, 3 S.W.3d 627, 640 (Tex.
App.--Houston [14th Dist.] 1999, no pet.).

Adjudication of Guilt

 In his first point of error, appellant argues that the evidence is "legally and
factually insufficient" to support the trial court's adjudication of his guilt because he
testified that he was defending himself against Michael, he did not have a knife, he
only poked Michael with the unknown object because Drakes was beating on him, it
was pure accident that he met back up with the Drakes at the stoplight after the first
fight, and Michael approached him in his car during the second fight. Appellant also
asserts that Conzata never saw appellant with a knife and that Michael approached
appellant in his car at the intersection during the second fight. In sum, appellant
contends that "the greater weight of the evidence supports his contention that he
defended himself against the aggressor, [Michael] Drakes."

 A person commits the offense of aggravated assault if the person intentionally
or knowingly threatens another with imminent bodily injury and uses or exhibits a
deadly weapon during the commission of the assault. Tex. Penal Code Ann.
§§ 22.01(a)(2), 22.02(a)(2) (Vernon Supp. 2008). A deadly weapon is defined as
"anything that in the manner of its use or intended use is capable of causing death or
serious bodily injury." See id. § 1.07(a)(17)(B) (Vernon Supp. 2008). Although a
knife is not a deadly weapon per se, a knife can be found to be a deadly weapon based
on the nature of its use or intended use. Garcia v. State, 17 S.W.3d 1, 4 (Tex.
App.--Houston [1st Dist.] 1999, pet. ref'd). To determine whether a particular knife
is a deadly weapon, courts have considered (1) the size, shape, and sharpness of the
knife; (2) the manner of its use or intended use; (3) the nature or existence of inflicted
wounds; and (4) testimony about the knife's life-threatening capabilities. Id. The
physical proximity of the accused and the victim during the commission of the
offense may also be considered. See Brown v. State, 716 S.W.2d 939, 946 (Tex.
Crim. App. 1986).

 Here, Conzata testified that appellant had become intoxicated at the sports bar,
appellant threatened the Drakes once they returned to his house, appellant and
Michael began fighting, appellant was holding something small in his hand and
slashing back and forth at Michael, and this item caused her husband to start bleeding
profusely on his torso and shoulders. After the initial fight and stabbing, the Drakes
left appellant's house, but appellant followed them in a car. The Drakes believed that
appellant was trying to harm them further, and Michael exited their car to protect his
family. Appellant then leaned out of his window and stabbed Michael again, and
Canzata saw her husband grab something and then heard a knife drop. Although she
never saw the weapon clearly, Canzata stated that she saw a "little bit" of the knife
in appellant's hand at the stoplight. Canzata also stated that her husband did not
have any weapons. Finally, Canzata testified that her husband suffered significant
injuries, including internal bleeding. Harris, the Drakes' daughter, also testified that
appellant had stabbed her father at the house and later at the intersection. Harris saw
a metallic blade in appellant's hand at the intersection, and, after the stabbing, she
applied pressure to her father's wounds and feared for his life. 

 Although appellant and appellant's fiancé testified to a different version of
events, even appellant testified that, during the fight, he had grabbed "a little piece
of metal or something" and tried to get Michael off of him. Appellant also agreed
that the Drakes left the house after the first fight, but he met up with the Drakes again
at an intersection. Although appellant contended that this second meeting was a
coincidence and that Michael was the aggressor, the trial court, as the sole trier of
fact, was entitled to determine the credibility of witnesses and reject appellant's and
Webb's testimony. The trial court could have reasonably found by a preponderance
of the evidence that appellant violated a term or condition of his community
supervision by committing the offense of aggravated assault by stabbing Michael
with a knife. As noted above, the State need only establish one sufficient ground for
revocation in order to support the trial court's order to adjudicate guilt. See Moore,
605 S.W.2d at 926. Accordingly, we hold that the trial court did not abuse its
discretion in adjudicating appellant's guilt.

 We overrule appellant's first point of error.

Excessive or Disproportionate Sentence

 In his second point of error, appellant argues that the trial court erred in
assessing its sentence because it is "excessive and disproportionate to the crime
committed" and violates the Eighth Amendment of the United States Constitution (4)
and article I, section 13 of the Texas Constitution. (5) Appellant asserts that the trial
court erred in failing to reinstate his community supervision.

 The Eighth Amendment requires that a criminal sentence be proportionate to
the crime for which a defendant has been convicted. Solem v. Helm, 463 U.S. 277,
290, 103 S. Ct. 3001, 3009 (1983) (citing U.S. Const. amend. VIII); see also
Baldridge v. State, 77 S.W.3d 890, 893 (Tex. App.--Houston [14th Dist.] 2002, pet.
ref'd) (stating that Eighth Amendment has narrow proportionality principle). The
Texas Constitution prohibits "cruel or unusual punishment." Tex. Const. art. I, § 13.

 However, in order to preserve for appellate review a complaint that a sentence
is grossly disproportionate, constituting cruel and unusual punishment, a defendant
must present to the trial court a timely request, objection, or motion stating the
specific grounds for the ruling desired. See Tex. R. App. P. 33.1(a); Rhoades v. State,
934 S.W.2d 113, 119-20 (Tex. Crim. App. 1996). 

 Here, after the trial court announced its sentence at the punishment hearing,
appellant made no objection to the trial court about the punishment assessed and did
not assert his claim under the Eighth Amendment and the Texas Constitution in the
trial court. Accordingly, we hold that appellant has waived his Eighth Amendment
cruel and unusual punishment complaints. See Ladd v. State, 3 S.W.3d 547, 564
(Tex. Crim. App. 1999) (concluding that defendant did not preserve cruel and unusual
punishment complaint for appellate review).

 We overrule appellant's second point of error.

Conclusion

 We affirm the judgment of the trial court.


 

 Terry Jennings

 Justice


Panel consists of Justices Jennings, Keyes, and Higley.


Do not publish. See Tex. R. App. P. 47.2(b).

1. See Tex. Penal Code Ann. § 22.02 (Vernon Supp. 2008). 
2. The State also alleged that appellant failed to report to his community supervision
officer, obtain suitable employment, perform community service at the ordered rate,
and pay required fees and restitution.
3. Rodriguez also testified that appellant had to report to a community supervision
officer, obtain suitable employment, participate in a community restitution program,
perform community service, and pay certain fees. Rodriguez stated that appellant had
failed to report to his community supervision for a period of three months, had been
unemployed for several months, had failed to perform community service hours, and
had been delinquent in his payment of ordered fees and restitution. On cross-examination, Rodriguez admitted that she only had personal knowledge of appellant's
failure to report during a one-month period, and she agreed that appellant had
completed 208 of the 320 hours of required community service and that appellant had
been paying the required fees whenever he could.
4. U.S. Const. amend. VIII.
5. Tex. Const. art. I, § 13.